UNITED STATES of America,
Plaintiff-Appellee,

v.

Paul D. OLSON, Defendant-Appellant.

No. 86–1820.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1986.

Decided June 23, 1987.

C. Paul Bradley, Chicago, Ill., for defendant-appellant.

Vilija A. Bilaisis, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

When confronted by national bank examiners with evidence that First Suburban National Bank of Maywood ("FSNB"), was in serious financial difficulty, FSNB's president and owner, Paul Olson, adopted a dubious rescue strategy which ultimately resulted in his conviction for conspiracy to misapply bank funds, 18 U.S.C. § 371, and misapplication of bank funds in violation of 18 U.S.C. § 656. In early January, 1982, national bank examiners from the Office of the Comptroller of the Currency informed Olson and FSNB's board of directors that the bank was in unsatisfactory financial condition since December 31, 1981 and therefore, could not pay a scheduled dividend in January of 1982.

The potential impact of such a restriction is evident from the financial structure of FSNB. The Bank was the sole asset of Olson's holding company, First Maywood, Inc., which had incurred a debt of $2,300,000 to purchase the stock of FSNB. This debt was personally guaranteed by Olson and required a semi-annual payment of approximately $270,000 in January and July of each year. Throughout 1979, 1980 and 1981, these installments were made with dividends paid by FSNB to the holding company. Therefore, the bank's inability to declare a cash dividend in January of 1982 threatened to plunge not only First

Maywood, Inc., but Olson himself into default on the holding company's loan, potentially resulting in a forfeiture of First Maywood Inc.'s sole asset, FSNB, to its creditors.

In order to vitiate this threat, Olson quickly arranged a sale and leaseback of the building which contained FSNB. Olson contacted a real estate broker, James Elliott, and indicated that he needed to proceed immediately. Elliott agreed to buy the building himself for $1,500,000, provided he did not have to use his own cash in the transaction. However, in order to book a profit on the sale and leaseback agreement sufficient to permit the declaration of a dividend by FSNB, the appearance of a 20% cash down payment was required. Therefore, Olson agreed to pay Elliott a 10% or $150,000 commission to be used toward the 20% down payment, thus increasing the purchase price of the building to $1,650,000.

On February 16, 1982, Olson informed FSNB's board of directors that he was negotiating a possible sale and leaseback transaction with a wealthy doctor. On the basis of this misrepresentation, he was given authority to personally negotiate a cash sale directly with this fictitious investor. Olson closed the sale and leaseback agreement with Elliott on February 25, 1982. Pursuant to the lease agreement, FSNB was to pay Elliott $21,000 per month rent, while Elliott was only required to pay the bank between $17,000 and $18,000 per month on a $1,320,000 non-recourse note. Moreover, because Elliott would not personally guarantee the note, he could discontinue payment to the bank should FSNB default on the lease agreement. According to the closing statement prepared by Olson's attorney, a $150,000 sales commission was paid to Elliott's girlfriend, Judy Pilot. However, those funds were later signed over to Elliott who used the money to fund a portion of the $330,000 down payment.

The remaining $180,000 down payment was funded by a loan to Kevin Kehoe, Elliott's brother-in-law to be, from Elgin National Bank ("ENB"). Olson owned a controlling interest and was chairman of the board at ENB and personally authorized the loan to Kehoe. When questioned about the loan by an ENB employee, Olson fraudulently indicated that the funds were to be used by Kehoe in a divorce settlement. Elliott pledged approximately $75,-000 in promissory notes which he owned as collateral on Kehoe's loan. The proceeds of the loan were wired to Kehoe's account at the First Security Bank of Glendale Heights and ultimately transferred to Elliott's account at that same bank. Elliott delivered his own check for $330,000 to Olson at the closing.

The day after the closing, FSNB's board of directors declared a dividend of $5 per share, totalling $303,000. Olson instructed one of his employees to deposit Elliott's $330,000 down payment check into FSNB's account at Sears Bank and transfer $303,-000 of that money into First Maywood, Inc.'s account which was used to pay the holding company's $275,000 installment payment. Ultimately, however, FSNB's cash dividend was disallowed and the bank was forfeited to First Maywood, Inc.'s creditors.

## I.

■■■ Olson appeals his conviction contending that the district court's jury instructions effectively directed a verdict against him for acts which are not illegal. We disagree. At trial the court issued the following instruction regarding misapplication of bank funds:

A "willful misapplication" is an unauthorized, unjustifiable or wrongful use of bank funds with the intent to injure or defraud the bank.

To show a willful misapplication the Government must prove a conversion of bank funds to the use of the defendant or a third party. However, actual loss need not be proved; it is sufficient that the defendant at least temporarily deprived the bank of the possession, control or use of its funds.

A willful misapplication may be accomplished by various means, such as where a bank officer or director, in effect, secures a loan for his own benefit by hav-

ing the bank lend money to a named debtor who, by a prior agreement, then transfers the money to the officer's benefit. Such activity constitutes a willful misapplication, even where the named debtor is financially capable and fully understands that it is his legal responsibility to repay the loan.

Initially, the appellant directs his argument to a line-by-line evaluation of this instruction, contending that taken in isolation, each sentence may have misled the jury. Such an approach, of course, has been repeatedly and thoroughly rejected. Instead we must consider the instructions as a whole to determine if they fairly and accurately summarize the applicable law. *See United States v. Anderson,* 798 F.2d 919 (7th Cir.1986); *United States v. Norwood,* 798 F.2d 1094 (7th Cir.1986); *United States v. Goudy,* 792 F.2d 664 (7th Cir. 1986); *United States v. Wiesner,* 789 F.2d 1264 (7th Cir.1986); *United States v. Xheka,* 704 F.2d 974 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

Specifically, however, Olson charges that the district court misstated the relevant case law by instructing the jury that the procurement of a loan for the benefit of a bank officer may constitute misapplication even where the named debtor is financially capable and fully understands that it is his legal responsibility to repay the loan. Such an instruction was obviously central to the jury's characterization of the ENB loan to Kevin Kehoe, made on behalf of Elliott and authorized by Olson. Olson maintains that because he believed that the loan was fully secured and that Elliott[1] was financially capable of repaying it, there could be no intent to injury or defraud Elgin Bank.

Without more, the making of a loan to a named debtor who is financially capable of repayment, but transfers the loan proceeds to a third party with the bank officer's knowledge, does not constitute willful misapplication. *See United States v. Galla-*

*gher,* 576 F.2d 1028 (3rd Cir.1978); *United States v. Gens,* 493 F.2d 216 (1st Cir.1974); *United States v. Docherty,* 468 F.2d 989 (2d Cir.1972). However, what Olson repeatedly ignores is that this proposition of law is inapplicable where the loan was made for the benefit of the bank officer. The court's instructions properly informed the jury that a loan made with the intent to defraud or injure a bank, for the benefit of an officer, constitutes misapplication of bank funds regardless of the named debtor's ability to repay the loan. *See United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985) ("By lending the bank's money in effect to himself in violation of accepted banking procedures, Angelos breached his fiduciary obligation to the bank, and it is irrelevant whether he thought, and thought correctly that the bank would not be hurt."); *United States v. Krepps,* 605 F.2d 101, 108 (3rd Cir.1979) ("willful misapplication in violation of § 656 is established when a bank officer secures a loan for himself by having the bank lend money to a named debtor who then transfers the funds to him even when the named debtor is financially capable and understands that it is his legal responsibility to repay the loan").

Thus, if the jury believed that the complicated morass of clandestine financial dealings initiated by Olson ultimately inured to his benefit as the personal guarantor of First Maywood, Inc.'s debt, they could have properly convicted him regardless of Kehoe's or Elliott's ability or willingness to repay the ENB loan. Olson's covert financial maneuverings, as well as his blatant misrepresentations, provide more than ample support for the jury's determination that he acted to defraud ENB. Moreover, the financial structure of FSNB clearly indicates that Olson, as the personal guarantor of First Maywood Inc.'s debt obligation, was the primary beneficiary of the sale and leaseback agreement and therefore the

---

1. Though the appellant argues that Olson could not be guilty of misapplication because he believed *Elliott* was capable of repaying the loan, the case law clearly establishes that it is the named debtor's ability to make repayment, in

this case Kevin Kehoe, which under different circumstances might be relevant. *See United States v. Gallagher,* 576 F.2d 1028 (3rd Cir. 1978).

ENB loan which made that transaction possible. Taken as a whole, the district court's jury instructions fairly and accurately summarized the applicable law while framing the central issues of the case.

The defendant's conviction is

AFFIRMED.