**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert L. BAILEY, Kevin Kehoe,**
**Robert M. Lang, and Harold J.**
**Ticktin, Defendants–Appellants.**

**Nos. 86–2963 to 86–2965, 86–2982.**

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1988.

Decided Sept. 22, 1988.

Q With whom else did you discuss this prior conviction of Mr. Key?
A Lynn Hall.

Q Any other juror?
A No."

Barry A. Spevack, Monico & Pavich, Robert A. Fisher, Frazin & Fisher, Michael D. Hayes, Holleb & Coff, Chicago, Ill., for defendants-appellants.

Chris G. Gair, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and GORDON, Senior District Judge.[*]

MANION, Circuit Judge.

A jury convicted Harold Ticktin, Kevin Kehoe, Robert Bailey, and Robert Lang of mail fraud, 18 U.S.C. § 1341, for their roles in various schemes to defraud the Federal Home Loan Bank Board (FHLBB), the Federal Savings and Loan Insurance Corporation (FSLIC), and the shareholders and depositors of Manning Savings and Loan Corporation, a now-defunct savings and loan in Chicago. The jury also convicted Ticktin on one count of violating the RICO statute, 18 U.S.C. §§ 1962 and 1963, various counts of misapplying the funds of a federally insured savings and loan, 18 U.S.C. § 657, and one count of conspiracy to misapply funds, 18 U.S.C. § 371. We affirm in part and reverse in part.

## I.

### Facts

The evidence, taken in the light most favorable to the government, reveals that Ticktin was the President of Manning Savings and Loan Corporation, a state-chartered savings and loan insured by the FSLIC. Ticktin was also a member of Manning's Board of Directors and a shareholder in Manning, as well as President of Manning's wholly-owned subsidiaries, Manning Service Corporation and Manning Production Corporation.

During 1980 and 1981, Manning's net worth began to decline; by April, 1981, Manning's net worth was below the minimum level set by federal regulations, and still declining. Federal regulators met with Ticktin and the Manning Board of Directors several times during the Spring of 1981 to discuss the problem. During these meetings, the federal regulators advised Manning that the 1980 dividend the board had declared was inappropriate because of Manning's decreasing net worth. The regulators asked the board to refrain from declaring any further dividends and from increasing salaries for the time being. The regulators also discussed with the board the possibility of Manning merging with another financial institution or allowing the FHLBB or state authorities to take over should Manning become insolvent.

In November, 1981, the FHLBB entered a temporary cease and desist order against Manning, requiring Manning to reduce expenses, refrain from paying dividends, and recapitalize. At that time, Manning's net worth was almost $500,000 below the required level. A forced merger or takeover by state or federal regulators was becoming a distinct possibility.

Faced with the imminent prospect of a forced merger or takeover, Ticktin embarked upon the first of several maneuvers to manipulate Manning's net worth and keep the FSLIC and FHLBB at bay. In November, 1981, Ticktin, on behalf of Manning Production Company, agreed to purchase interests in five Texas oil wells from Dalco Petroleum Company for $1,500,000. Manning Production, that same day, sold the interests to ITEX for $4,000,000. Manning and Manning Production supplied all the financing for ITEX's purchase. ITEX gave Manning a $1,000,000 full-recourse note. ITEX also gave Manning Production a $3,000,000 note. The $3,000,000 note was a non-recourse note, so if the oil wells did not produce, ITEX would not have to pay Manning Production on the note. But the non-recourse language did not appear on the note's face, as is standard; instead, a separate side agreement provided that the note would be non-recourse.

Ticktin wanted to record a profit immediately from the Dalco/ITEX transaction so he could increase Manning's net worth immediately. Ticktin requested opinions from four certified public accountants regarding whether he could record a profit

[*] The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

from the transaction; he wanted the answer in a hurry. The first two accountants told Ticktin that Manning could not record any profit from the transaction. The other two told Ticktin that Manning could record a profit. Ticktin accordingly recorded a $2,164,000 profit from the Dalco/ITEX deal, and reported that profit to the FHLBB. Ticktin, however, had not informed any of the accountants about the non-recourse side agreement; the belief that ITEX would be ultimately liable on the $3,000,000 note to Manning Production was a material factor in the opinions of the two accountants who advised Ticktin that he could record a profit.

James Scanlon was one of the accountants who approved the profit entry. Ticktin subsequently hired Scanlon's firm to conduct Manning's annual spring audit in 1982. While doing the audit, Scanlon attempted to certify that Manning had provided him with all documents concerning the Dalco/ITEX transaction. Ticktin assured Scanlon that Manning had provided the documents. However, Ticktin later misrepresented to Scanlon that Manning had released ITEX from personal liability on the $3,000,000 note in April, 1982.

Soon after the Dalco/ITEX transaction, Manning's net worth began to decline again. In March, 1982, the FHLBB challenged the Dalco/ITEX profit and drafted a proposed merger resolution for Manning. Sensing that Manning's net worth needed another boost, Ticktin returned to the oil business. In May, 1982, Ticktin instructed David Leibson, Manning's in-house counsel, to form a new corporation to buy oil and gas leases from Manning. Paul D. Olson was to be the corporation's sole shareholder. Manning and Olson were well-acquainted, and had a number of common economic interests. The corporation was named PDO Corporation (PDO).

On May 27, Ticktin, on behalf of Manning Production, purchased interests in three oil well leases from ITEX for $2,250,000. That same day, Manning Production sold the leases for $4,500,000 to PDO. PDO was eight days old at the time and had assets of $1,000, the amount of capital Olson paid in to start the corporation. To pay for the leases, PDO gave Manning Production a non-recourse note for $4,500,000. Ticktin recorded a $2,214,000 "profit" on the PDO transaction.

On July 14, 1982, an Administrative Law Judge found that Manning had improperly recorded a profit on the Dalco/ITEX transaction. The ALJ also found that Manning's net worth as of April 30, 1982 was negative $681,431. The ALJ entered a recommended order requiring Manning to meet its net worth requirements within twenty days or merge with another institution. The FHLBB adopted this order in October, 1982.

Against this background, Ticktin decided to take Manning into condominium financing. Jim Elliott and Kevin Kehoe, real estate brokers, were selling condominiums in a development in Orland Park, Illinois. First Security Bank of Glendale Heights, a bank in which Elliott had an interest, had been supplying the financing. After First Security ran out of money to finance the condominiums, Elliott turned to Ticktin. In late July, 1982 (shortly after the ALJ issued his recommended order), Ticktin agreed to have Manning finance 72 condominiums in Orland Park.

Kay Dwyer, Manning's vice-president, processed the loans. Manning's practice in the past had always been to verify borrowers' employment, deposits, and credit before making loans. Ticktin told Dwyer that she would not have to verify those items before making the Orland Park loans. Ticktin did tell Dwyer to obtain appraisals. Ticktin, however, told her what appraiser to use. The appraisals all came in together within two weeks and were merely photocopies, with only unit numbers changed. All two-bedroom units were appraised at the same price, regardless of location, as were all one-bedroom units.

Elliott and Kehoe sold the units at an inflated purchase price. Manning financed over 100 percent of the condominiums' true market value, and all but ten percent of the purchase price. The seller took second mortgages for the remainder of that price. Elliott and Kehoe received a commission of

$15,000 on each condominium they sold. Elliott's commissions totalled $1,000,000 and Kehoe's $172,000. Ticktin knew about these commissions.

In September, 1982, the FHLBB was on the verge of closing Manning down. Ticktin told Elliott that he had to "book a profit to keep the regulators at bay." Ticktin felt that buying and selling condominiums would again be a good way to do this. On October 28, on behalf of Manning Service Corporation, he purchased 123 condominiums and nineteen mortgages in Forest Park, Illinois for $3,400,000. Ticktin simultaneously sold the condominiums, in blocks of multiple units, to ten purchasers that Elliott, Kehoe, and Lloyd Tuttle recruited. Ticktin agreed to pay Elliott a commission of $10,000 per unit.

Ticktin set the purchase price and the financing terms. Nine of the purchasers bought twelve condominiums for $804,000, and a tenth bought fifteen condominiums for $1,009,800. Manning financed 100 percent of the purchase price: Manning loaned 80 percent of the price to each purchaser, and each purchaser executed a second mortgage for the remaining 20 percent. Although Manning's loan files contained appraisals justifying the purchase price, those appraisals were rife with inaccuracies and misrepresentations. The condominiums were overpriced, and Manning actually lent more than 100 percent of the fair market value of each.

Ticktin engineered the Forest Park deal so he could book a profit, increase Manning's net worth, and stave off action by the FHLBB. He soon learned from his accountants that he could not record any profit unless he could show a 20 percent down payment from the purchasers. Ticktin therefore had to devise a plan to create the appearance of a down payment. Ticktin's first idea was to loan $1,649,160 (20 percent of the total price) to Olson, who would then return the money as a supposed down payment from the purchasers. This plan fell through when Olson refused to participate unless Ticktin paid him $50,000.

After Olson refused to participate, Ticktin told Elliott to find additional people to borrow money to use for the down payments. Elliott recruited his parents, and Tuttle recruited Robert Bailey and Robert Lang. All four executed documents borrowing $229,790 from Manning; at the same time, each received Manning's irrevocable commitment to buy back the loan at the borrower's option, and each signed a letter exercising that option.

The loans to Bailey, Lang, and Elliott's parents provided only $919,160 toward the appearance of a 20 percent down payment. Two sources provided the rest of the down payment. Manning "bought" (no money ever changed hands) second mortgage notes from Elliott on another set of condominiums in Worth, Illinois. Manning paid the face value of $363,020 for these notes, even though the first mortgages on the Worth condominiums were delinquent. Ticktin also coerced Elliott into returning $361,000 of his commission on the Forest Park condominiums. Ticktin told Elliott that unless Elliott rebated $361,000, the whole deal would be off because Manning needed that amount to record a profit.

On November 16, Manning wired $2,510,-760 to Elliott's account at Sears Bank. That $2,510,760 represented the money from the notes to Bailey, Lang, and Elliott's parents, the money from the sale of the Worth second mortgages, and Elliott's total commission. That same day, Sears Bank wired $1,649,160 (20 percent of the total Forest Park purchase price) from Elliott's account to Manning. The money wired back from Sears Bank served as the down payment on the Forest Park transaction.

After completing the transaction, Ticktin asked an accountant whether he could record a profit. Ticktin wanted the answer "lickety-split." Because there appeared to be a sufficient down payment, the accountant told Ticktin that Manning could record a profit. Ticktin reported a $2,263,000 profit. Actually, no profit could be properly recorded because all the funds in the transaction originated from Manning.

All the time Ticktin was manipulating Manning's books, he was also drawing extraordinarily high salaries, bonuses, and

other compensation. In 1981, Ticktin's salary was $85,000. By May, 1982, his salary was $100,000—despite Manning's precarious financial position and the FHLBB's express concern that Manning hold down expenses. Ticktin's 1982 compensation included much more than his salary. On January 5, 1982, Manning's five-member Board of Directors—which included Ticktin, Ticktin's father, Ticktin's wife, and Ticktin's father-in-law—voted Ticktin a $30,000 bonus. Ticktin himself voted to grant this bonus. Only four months later, on May 3, 1982, the Manning board (with Ticktin this time abstaining) voted Ticktin a $70,000 bonus for "the fantastic job that President Ticktin has done maintaining the net worth of the Association in these perilous times...." The times were indeed perilous but there was no net worth; Manning was insolvent. On December 16, 1982, two months after the FHLBB adopted the ALJ's recommended order that Manning increase its net worth or merge, the board (again, with Ticktin abstaining) voted Ticktin a $100,000 bonus "for the exemplary work that he has done turning the Association around and for the profits he has generated through Manning Service Corporation." The bonus was paid to Ticktin on January 26, 1983; one week later, the FSLIC closed Manning down.

Besides the salary and bonuses, Ticktin received substantial other consideration from Manning in 1982. In April, 1982, Ticktin received an assumable loan of $228,000 for 95 percent of the purchase price for a condominium in Scottsdale, Arizona. To help cover his Arizona living expenses, Manning gave Ticktin a $1,500 per month Arizona living allowance. Manning also bought two automobiles for Ticktin; a $12,000 automobile for his use in Arizona, and a $47,000 automobile for his use in Illinois. Finally, Manning paid Ticktin a $30,000 consulting fee. All told, Ticktin's compensation in 1982 from Manning—which was insolvent all or most of that year—totalled at least $289,000.

From February, 1982 onward, Ticktin had the sole authority to approve loans from Manning. During that time, while Manning was sinking, Ticktin made a number of substantial questionable loans. Many of these loans benefited Ticktin and his associates (primarily Olson and Elliott). On July 20, 1982, Ticktin made a $260,000 unsecured loan (the first Kay Dwyer had ever seen Manning make) to Olson. Two days later, Olson loaned Ticktin $287,650 from Olson's bank, the First Suburban Bank of Maywood.

A second loan from Manning to Olson on September 7, 1982, arose from prior dealings between Ticktin, Olson, and William Powers. Ticktin, Olson, and Powers had borrowed approximately $1,700,000 from American National Bank (ANB) in Chicago to purchase the Elgin National Bank. Elgin National Bancorp, Elgin National Bank's holding company, also owed ANB $3,000,000. As of August, 1982, both the individuals' and the Bancorp's obligations to ANB were in default. On September 2, Olson agreed to assume Ticktin's individual loan and guarantee of Powers' loan. ANB agreed to continue the $3,000,000 Elgin Bancorp loan if Olson paid the individual loans within one week. Five days later, Ticktin loaned Olson $1,593,000 from Manning Service Corporation, secured by 108,023 shares of Elgin Bancorp stock. There were two problems with this collateral: Elgin Bancorp was in default on its $3,000,000 loan, and Elgin Bancorp's loan from ANB was secured by stock in Elgin National Bank. ANB had first priority on the Elgin National Bank stock. If Elgin Bancorp could not meet its obligations to ANB (and its track record was not very good), ANB could take the Elgin National Bank stock, which was Elgin Bancorp's underlying asset. Thus, the Elgin Bancorp stock was worth little, if anything, as collateral, and the loan from Manning to Olson was undercollateralized. After Olson received the money from Manning Service Corporation, he used it to extinguish the outstanding individual obligations to ANB.

Six days after the $1,593,000 loan to Olson, Ticktin loaned $300,000 to Tuttle and $300,000 to Kehoe from Manning Service Corporation. Ticktin told Ted Guillem, a Manning vice-president, to use $350,000 of the loan proceeds to pay off part of the

loan that Ticktin had made to Olson on September 7, and $150,000 to pay off part of a loan that Ticktin had made to Elliott. As part of this transaction, Olson gave Tuttle and Kehoe shares of Elgin National Bank stock; Tuttle and Kehoe pledged those shares as collateral for their loans. Inexplicably, though, Kehoe pledged twice as many shares as Tuttle for the same loan.

When Manning failed, the United States Attorney's office investigated the circumstances. That investigation resulted in a twenty-one count indictment naming Ticktin, Olson, Kehoe, Elliott, Lang, Bailey, and Michael Kelley, a purchaser in the Forest Park deal, as defendants. Elliott and Kelley pleaded guilty and testified for the government at the trial. Olson, who was tried along with the remaining defendants, was found guilty on six of seven charges. He has appealed, but his appeal is not part of this consolidated appeal. The jury found Ticktin, Kehoe, Bailey, and Lang guilty on all counts charged.

## II.

### Sufficiency of the Mailings in Counts Five, Six, and Seven

■ The only counts in the indictment naming Kehoe were Counts Five, Six, and Seven. In those counts, the grand jury charged Ticktin, Elliott, and Kehoe with mail fraud in connection with the Orland Park condominium transaction. Each of those counts alleged the mailing of recorded mortgages from the Recorder of Deeds to Manning as the count mailing. In *United States v. Kwiat*, 817 F.2d 440 (7th Cir. 1987), we held that similar mailings were insufficient to support Kehoe's conviction for mail fraud in connection with the part of the Orland Park condominium deal that

First Security Bank of Glendale Heights financed. Kehoe contends that we must reverse his convictions here in light of *Kwiat*. The government has confessed error on Kehoe's convictions, and we agree with the parties that the mailings alleged in Counts Five, Six, and Seven are indistinguishable from those alleged in *Kwiat*. Therefore, we reverse Kehoe's conviction.

■ Counts Five, Six, and Seven also charged Ticktin with mail fraud. Ticktin did not raise the sufficiency of the mailings in those counts in his opening brief. But it would be plain error to affirm Ticktin's conviction on those counts while holding that those counts fail against Kehoe. *See Kwiat*, 817 F.2d at 444; Fed.R.Crim.P. 52(b). Therefore, we also reverse Ticktin's convictions on Counts Five, Six, and Seven.[1]

## III.

### Sufficiency of the Evidence to Convict Bailey and Lang

Bailey and Lang were each charged with and convicted of one count of mail fraud. They contend that there was insufficient evidence to prove that they intended to defraud the FSLIC, FHLBB, or Manning's depositors and shareholders. We agree.

■ To convict Bailey and Lang, the government could not simply show that they participated in a transaction that turned out to be part of a fraudulent scheme. The government also had to show Bailey's and Lang's "willful participation in [the] scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *United States v. Price*, 623 F.2d 587, 591 (9th Cir.1980); *see also United States v. Pearlstein*, 576 F.2d 531, 537 (3d Cir.1978); *United States v.*

---

1. Reversing these three mail fraud convictions does not, as Ticktin argues, automatically require that we reverse his convictions on all the counts in the indictment. All of the indictment's counts were properly joined, Fed.R. Crim.P. 8(a), and there was no basis for a severance under Fed.R.Crim.P. 14. Also, all of the indictment's charges were similar in character and arose from the same overall scheme to loot Manning. Finally, most, if not all, of the evi-

dence admitted on Counts Five, Six, and Seven would have been admitted even absent those counts. Therefore, our reversing Ticktin's convictions on Counts Five, Six, and Seven does not require us to reverse his convictions on the other counts. *See generally United States v. Holzer*, 840 F.2d 1343, 1349–50 (7th Cir.1988); *United States v. Dicaro*, 772 F.2d 1314, 1320–21 n. 4 (7th Cir.1985).

*Stull,* 743 F.2d 439, 442 (6th Cir.1984). "[T]he requisite mental state in a prosecution for fraud is a specific intent to defraud and not merely knowledge of shadowy dealings." *United States v. Piepgrass,* 425 F.2d 194, 199 (9th Cir.1970).

■ Tuttle recruited Bailey and Lang to borrow money to serve as a down payment for the Forest Park purchasers. Elliott and Tuttle met one day with Bailey at a restaurant and explained the transaction to him. Elliott would pay Bailey $5,000 in exchange for using Bailey's name and being able to make the loan. Bailey looked "a little bit funny" and "raised his eyebrows." He asked Elliott if the transaction was legitimate; Elliott responded that it was, explaining that his parents were entering into the same deal, and that a savings and loan president (Ticktin) would be standing behind the non-recourse aspect of the note. After also receiving assurances from Tuttle that the transaction was legitimate, Bailey agreed to participate.

Tuttle later contacted Lang and told him about the transaction. Tuttle explained the transaction to Lang as Elliott had explained it to Bailey, and assured Lang that it was legitimate. Lang also agreed to participate.

A few weeks passed. On November 17, 1982, Bailey and Lang received phone calls telling them to come to Elliott's office and sign the loan papers for the Forest Park deal. Bailey and Lang both signed documents borrowing $229,790 from Manning. The loans were secured by second mortgages from the Forest Park purchasers. Bailey and Lang also received letters from Ticktin on Manning stationery. The letters allowed Bailey and Lang to discharge their loans by tendering the collateral back to Manning within thirty days of the loan's maturity date; Manning was irrevocably committed to take back the collateral and discharge the debt. At the same time, Bailey and Lang signed letters exercising their options to tender the collateral back to Manning. Thus, Bailey and Lang got into and out of the transaction on the same day, and made $5,000 for their efforts.

The government offered no direct evidence that Bailey and Lang intended to defraud the FSLIC, FHLBB, or Manning's depositors and shareholders. The *only* direct evidence concerning Bailey's and Lang's participation was Elliott's and Tuttle's testimony—and both Elliott and Tuttle testified that they had assured Bailey and Lang that the transaction was legitimate.

Direct evidence, however, is not necessary to prove knowledge and intent to defraud. The government contends that the circumstances surrounding the loan transaction allowed the jury to properly infer Bailey's and Lang's guilty knowledge and intent. Alternatively, the government argues that the jury could properly infer that Bailey and Lang suspected that the transaction might be defrauding Manning but deliberately avoided further knowledge for fear of what they might learn. This combination of suspicion and deliberately avoiding further knowledge may support an inference of actual knowledge or criminal recklessness sufficient to convict. *See United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.1986). The district court gave an "ostrich" instruction, informing the jury that it could "infer knowledge from a combination of suspicion and indifference to the truth." *See id.* at 190.

The government characterizes its circumstantial case against Bailey and Lang as "powerful"; we characterize it as insufficient. The scheme was one to deceive the FSLIC, FHLBB, and Manning's depositors and shareholders. As we will discuss in more detail later, the government's theory was that Ticktin fraudulently inflated Manning's net worth to keep the federal regulators at bay so he could keep Manning open and plunder it. Nothing suggests that Bailey and Lang knew or had reason to know about Manning's precarious financial position, the FHLBB's scrutiny, or Ticktin's efforts to manipulate Manning's books. There is no evidence that Bailey or Lang had any expertise in banking or real estate financing. *Cf. Pearlstein,* 576 F.2d at 543–44. The government notes that both Bailey and Lang were small businessmen who were involved in local politics.

But to infer any special knowledge from this requires too great a leap; the government offered very little detail about Bailey's and Lang's business and political experience, and not all small businessmen and politicians are familiar enough with real estate financing to suspect an illegal or fraudulent transaction. Bailey and Lang may have suspected (or even known) that the loan transactions they were entering were not "standard operating procedure." But Elliott and Tuttle, both highly regarded and respected real estate brokers at the time, assured Bailey and Lang that the deal was legitimate. *Compare United States v. Browne*, 225 F.2d 751, 758 (7th Cir.1955). The evidence reveals no reason why Bailey and Lang should have doubted Elliott and Tuttle. Bailey and Lang had been involved in other deals with Elliott and Tuttle (including Orland Park); the government does not suggest that Bailey or Lang had reason to doubt that those transactions were legitimate. Elliott even told Bailey that Elliott's parents were involved in the same transaction. Bailey and Lang also had Ticktin's assurance, implied through his participation, that the transaction was legitimate. There was no evidence that Bailey or Lang knew Ticktin personally. They knew only that he was President of Manning Savings and Loan. Ticktin's participation would tend to signal that the transaction was not one meant to harm Manning.

The "ostrich" instruction does not save this conviction. "[I]t takes a fairly large amount of knowledge" to permit a jury to infer guilty knowledge under an "ostrich" theory; "to permit an inference of knowledge from just a little suspicion is to relieve the prosecution of its burden of showing every element of the case beyond a reasonable doubt." *Ramsey*, 785 F.2d at 190. There was no evidence—except, perhaps, Bailey's "raised eyebrows" and "funny" look—that Bailey or Lang harbored any suspicion that would have required them to investigate Manning or Ticktin's relationship and dealings with Manning or

that Bailey or Lang deliberately avoided seeking further knowledge for fear of what they might learn. In fact, as we have noted, Bailey did ask, and he was assured by two people with much greater expertise and experience than he that the deal was legitimate. Speculation, "funny" looks, and "raised eyebrows" are not sufficient to convict people for knowingly participating in a scheme to defraud. Therefore, we reverse Bailey's and Lang's convictions.

## IV.

### The Validity of Ticktin's Mail Fraud Convictions in Light of *McNally v. United States*

■ In *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court rejected the so-called "intangible rights" theory of mail fraud, holding that the mail fraud statute makes criminal only schemes intended to deprive people of property rights. *See id.* 107 S.Ct. at 2879–80; *see also Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987). Ticktin asserts that we must reverse his mail fraud convictions in light of *McNally*.[2]

Ticktin contends that the indictment's mail fraud counts do not state an offense under *McNally*. At first blush, Ticktin appears to be right. The specific charging language in each of the mail fraud counts alleges that Ticktin schemed to defraud Manning's depositors and shareholders, the FSLIC, and the FHLBB "out of their right to have the affairs of the Manning Savings and Loan Association conducted honestly, fairly, and free from craft, trickery, deceit, corruption, dishonesty and fraud." Standing alone, this language does not pass muster under *McNally;* the right to honest services is "too ethereal in itself to fall within the protection of the mail fraud statute...." *Carpenter*, 108 S.Ct. at 320.

Even though each specific charge is couched in "intangible rights" language, the substantive allegations in each mail

---

**2.** Bailey, Lang, and Kehoe also challenged their convictions as invalid under *McNally*. Because we have reversed their convictions for other

reasons, see *supra* at 1274–77, we consider only Ticktin's *McNally* challenge.

fraud count charge a "scheme that had substantial potential to take other people's property by fraud," and therefore state offenses under *McNally*. *United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988). As we noted in *United States v. Wellman*, 830 F.2d 1453, 1462 (7th Cir.1987), the common thread running through "intangible rights" cases is that they involve rights whose violation would ordinarily result in no concrete economic harm; that is not the case here. All eleven mail fraud counts charged that Manning was in a precarious financial position, and that Ticktin artificially inflated Manning's net worth. The counts also charged that Manning was an insured institution, with the FSLIC insuring each depositor's account up to $100,000. The counts also state that Ticktin's family members controlled the Board of Directors and had the authority to grant Ticktin salary, loans, and bonuses. Each count thus alleged schemes with the potential to expose Manning's money and property to plunder by artificially keeping Manning in operation. This could affect the property interests of the depositors, shareholders, and FSLIC, which would be potentially on the hook for some or all of the depositors' losses.

The mail fraud counts also alleged other affected property interests. The Forest Park counts alleged that Ticktin loaned more than $6,500,000 with no down payments to the Forest Park purchasers, and $916,160 to Bailey, Lang, and Elliott's parents to create the appearance of a down payment. These counts also alleged that Ticktin paid commissions to Elliott as part of the deal. These counts thus alleged that Ticktin defrauded Manning's shareholders and depositors out of their property interests by committing Manning's funds to the loans, depriving Manning of down payments it would have otherwise received, and paying Manning's funds to Elliott for commissions.

The Dalco/ITEX count alleged that Ticktin paid $1,500,000 for the oil and gas leases, and financed the resale that same day for $4,000,000. Of that $4,000,000, $3,000,000 was both undersecured and without recourse, thus putting Manning's funds at greater than usual risk. The PDO counts alleged that Manning purchased leases from ITEX for $2,250,000, sold them to PDO for $4,500,000, and financed PDO's purchases. The PDO counts also alleged that on May 3, 1982, the directors voted a $70,000 bonus to Ticktin.

■ Thus, although the government would no doubt draft the indictment differently today, the indictment sufficiently alleged mail fraud offenses even after *McNally*. But the indictment also alleged "intangible rights" mail fraud. We must examine the jury instructions, along with the evidence and arguments at trial to see if the jury necessarily convicted Ticktin of conduct that constituted an offense. *See Wellman*, 830 F.2d at 1462–63.

■ The trial judge properly instructed the jury that to convict Ticktin it had to find beyond a reasonable doubt:

 1) that the defendant knowingly participated in a scheme to defraud, as described in the indictment;

 2) that, for the purpose of carrying out a scheme or attempting to do so, the defendant used the United States mails or caused the United States mails to be used in a manner charged in the particular count;

 3) that the defendant did so knowingly and with the intent to defraud.

The instructions also defined a "scheme" and "intent to defraud":

 A "scheme" means some plan or course of action intended to deceive another and to deprive another of something of value by means of false pretenses, representations, or promises.

 It is not necessary that the government prove all of the false pretenses, representations, promises, and acts charged in the indictment. However, it is essential that the evidence establish beyond a reasonable doubt that the defendants intended to deceive the shareholders, depositors, or the FSLIC to their detriment.

 . . . .

 To act with intent to defraud means to act willfully and with the specific intent

to deceive or cheat; ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself or another.

The judge further instructed the jury that:

It is a theory of Harold J. Ticktin's defense in this case that he undertook all of his activities with respect to the ITEX, PDO, Orland Park, and Forest Park transactions in good faith for the purpose of benefiting rather than injuring the financial position of Manning Savings and Loan Association, and not for the purpose of his own improper financial gain. Since it is an element of all the crimes charged that Defendant Harold J. Ticktin had the intent to injure or defraud the association, you should acquit him if you find the government has not proved beyond a reasonable doubt that Defendant Ticktin had the requisite intent.

Ticktin argues that the court's instructions did not sufficiently ensure that the jury convicted him only for schemes that injured (or could have injured) the victims' property rights. When examining the sufficiency of jury instructions we must examine the jury charge as a whole, rather than focus on isolated passages. Moreover, because " 'a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge,' " we review the instructions in the context of the overall trial and the arguments by counsel. *See United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

Ticktin asserts that the definition of "scheme" does not limit "something of value" to money or property. In *Wellman*, we found the same language to be consistent with *McNally*. *See* 830 F.2d at 1463. Unlike *United States v. Holzer*, 840 F.2d 1343, 1346 (7th Cir.1988), nothing in the instructions specifically advised the jury that "intangible rights" could be "something of value" for purposes of finding a scheme.

The jury instruction defining "intent to defraud" equated that intent with an intent to cause financial loss to another or bring about financial gain to oneself. Ticktin complains that the word "ordinarily" made the instruction open-ended, and allowed the jury to find intent even absent an intent to bring about financial gain or loss. We think, however, that Ticktin parses this instruction much more closely than the average juror would; read naturally, the instruction defining intent focuses on financial gain or loss. Furthermore, Ticktin's "good faith" theory of defense instruction (which Ticktin has understandably ignored on appeal) clearly equates intent to defraud with an intent to injure Manning and bring about improper financial gain for Ticktin. Taken together, the intent instruction and Ticktin's good faith instruction adequately informed the jury that it had to find conduct aimed at injuring Manning's financial interests to convict Ticktin of mail fraud. A scheme to injure Manning financially is necessarily one to injure its shareholders and depositers financially.

Finally, the evidence and arguments in this case emphasized that the schemes were aimed at Manning's property. This case is unlike *Holzer* and *Ward v. United States*, 845 F.2d 1459 (7th Cir.1988), where the government's attorneys argued at trial that the jury should convict the defendants for depriving their victims of honest services but then adopted a different argument on appeal. From the beginning of the trial, the government's theory has been that Ticktin had "looted" Manning through a series of mail fraud schemes and misapplications. The jury heard testimony about how Ticktin's schemes depleted Manning's assets. And the closing arguments are replete with references to Ticktin using the transactions in the mail fraud schemes to artificially keep Manning open so he could divert more of its assets into his own pocket. Manning was, as the government puts it, "the goose that laid the golden eggs" and Ticktin had to keep that goose alive

while there were still eggs to be gathered.[3]

■ In sum, the indictment adequately alleged conduct that violated the mail fraud statute, and the trial evidence and arguments, along with the jury instructions, convince us that the jury necessarily found that Ticktin's schemes were aimed at his victims' property rights. Therefore, Ticktin's mail fraud convictions (except, as we have already noted, the Orland Park convictions) were proper.[4]

## V.

### Ticktin's Convictions for Misapplying Manning's Funds

Ticktin challenges the sufficiency of the evidence to convict him for misapplying Manning's funds and the district court's refusal to give certain jury instructions on misapplication that he tendered. The savings and loan misapplication statute, 18 U.S.C. § 657 states, in relevant part:

> Whoever, being an officer ... of ... any ... savings and loan association ... the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... willfully misapplies any moneys, funds, credits, securities, or other things of value belonging to such institution or pledged or otherwise entrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both....

The district court instructed the jury that:

> To sustain a charge of willful misapplication by Ticktin ... the government must prove the following propositions:
> First, that at the time of the offense charged, the defendant was an officer, an agent, an employee of or connected in

any capacity with Manning Savings and Loan Association;

> Second, that the Manning Savings and Loan Association was an insured association;
> Third, that the defendant used his position as an officer and agent to willfully misapply moneys, funds and credits belonging to the association, or entrusted to its care;
> Fourth, that the defendant did so willfully and with the intent to injure or defraud the association.
> . . . .
> A "willful misapplication" ... is an unauthorized, unjustifiable, or wrongful use of the association's funds with the intent to injure or defraud the association.
> To show a willful misapplication, the government must prove a conversion of [the] association's funds to the use of a defendant or third party. However, ... actual loss need not be proved. It is sufficient that the defendant at least temporarily deprived the association of the possession, control or use of its funds.
> The word "willfully" means that the person knowingly and intentionally committed the acts which constitute the offense charged.

The district court's instructions accurately stated the elements of a § 657 violation. *See United States v. Marquardt*, 786 F.2d 771, 785 (7th Cir.1986). The district court also accurately defined the term "willful misapplication." *See United States v. Olson*, 825 F.2d 121, 122–23 (7th Cir.1987). But Ticktin argues that the instructions were incomplete and did not adequately

---

**3.** Ticktin argues that the jury instruction defining a "scheme" allowed the jury to convict Ticktin solely for conduct "intended to deceive ... the FSLIC." But the trial evidence and arguments made clear that deceiving the FSLIC was an integral part of defrauding Manning's shareholders and depositers of their property; the FSLIC and FHLBB had the power to shut Manning down and thus deny Ticktin access to Manning's funds. Moreover, as the indictment alleged, the FSLIC had a property interest at stake: the $100,000 per depositer it might have had to pay had Manning gone under. Thus, the

reference to scheming to deceive the FSLIC does not require us to reverse Manning's conviction.

**4.** Since the RICO count alleged the substantive mail fraud counts as predicate offenses and we have upheld Ticktin's other mail fraud convictions, we also uphold his RICO conviction even though we have reversed Counts Five, Six, and Seven. The jury has "no discretion to pick and choose among predicate offenses." *Holzer*, 840 F.2d at 1351.

distinguish between criminal misapplication and mere maladministration. Ticktin appeals the district court's decision to refuse to give several of his tendered instructions that he claims would have cured this alleged defect.

### A. *The Bonus Counts.*

The jury convicted Ticktin on Counts 14, 15, and 20, for accepting bonuses from Manning. Since the Board of Directors voted him the bonuses, Ticktin tendered an instruction stating that the board's consent was a complete defense to the misapplication charges. Ticktin based this instruction on *United States v. Britton*, 108 U.S. 193, 2 S.Ct. 526, 27 L.Ed. 701 (1883) (*Britton III*). In *Britton III*, the indictment charged that Britton, who was president of the National Bank of the State of Missouri, had made a promissory note to his brother, who endorsed it back to Britton. Britton submitted the note to the bank's Board of Directors who discounted the note, and Britton took the proceeds for his own use. At the time, Britton knew that both he and his brother were insolvent. The Supreme Court held that the Board of Directors, "knowing all the facts," could discount the note, and that the indictment did not charge an offense against Britton. *Id.* at 197, 2 S.Ct. at 529.

*Britton III* does not stand for the broad principle that consent by the Board of Directors is an absolute defense to misapplication. *Britton III* turned on a technical defect in the pleadings: the indictment did not charge that Britton had fraudulently procured the discount. *See id.* In any event, the Court's subsequent decision in *Evans v. United States*, 153 U.S. 584, 14 S.Ct. 934, 38 L.Ed. 830 (1893) undercut the broad reading of *Britton III* that Ticktin proposes. In *Evans*, a bank director was charged with (among other things) aiding and abetting the bank's cashier's misapplication by presenting a note to the cashier to discount; both knew that the note was not adequately secured. *Id.* at 591–92, 14 S.Ct. at 937–38. One of Evans' arguments for dismissing the charge was that the indictment did not charge that the cashier

was not authorized to discount the note. *Id.* at 592–93, 14 S.Ct. at 938. The Court held even if the board had authorized the cashier to discount the note, if he discounted it with the intent to defraud the bank he would be guilty of criminal misapplication. *Id.* at 593, 14 S.Ct. at 938. Thus, under *Evans*, the Board of Directors' consent is not an absolute defense to a misapplication charge.

As more recent cases have held, the board's consent is an important factor to consider in determining whether a defendant attempted to defraud an institution. But if intent to defraud or injure exists, the Board of Directors' approval is irrelevant. *See United States v. Cauble*, 706 F.2d 1322, 1353–54 (5th Cir.1983); *United States v. Beran*, 546 F.2d 1316, 1321 (8th Cir.1976).

Ticktin submitted a second instruction that the district court refused to give concerning the bonuses. This instruction would have told the jury that Ticktin's "acting in his official capacity in accepting the salary and bonuses" was a complete defense. Ticktin based this instruction on another in the line of *Britton* cases, *United States v. Britton*, 108 U.S. 199, 2 S.Ct. 531, 27 L.Ed. 698 (1883) (*Britton IV*). In *Britton IV*, Britton was charged with misapplying the bank's funds by conspiring with another director to persuade the bank's directors to declare a dividend even though he knew that the bank had no net profits with which to pay it. *Id.* at 206, 2 S.Ct. at 535. The Court held that "[t]he declaring of a dividend by the association when there were no net profits to pay it ... is an act done by an officer of the association in his official and not in his individual capacity" and was therefore not a misapplication. Read broadly, *Britton IV* seems to hold that any act performed by an officer in his official capacity is not a misapplication.

However, *Evans* undercuts this broad reading of *Britton IV*, just as it undercuts the broad reading of *Britton III*. *Evans* held that a bank officer or employee who fraudulently discounts a worthless note commits a criminal misapplication, even

though discounting notes is part of his job (i.e., his "official capacity"). *Evans,* 153 U.S. at 593, 14 S.Ct. at 938. Similarly, as the Third Circuit stated almost forty years ago in construing *Britton* and *Evans,* "[i]f a dividend be illegally declared with the intent to defraud the bank the persons responsible for the declaration face criminal sanctions and have committed the crime defined by the statute." *United States v. Matsinger,* 191 F.2d 1014, 1017 (3d Cir. 1951). Intent is the key element: "[T]he gravamen of the offense consists in the evil design with which the misapplication is made...." *Evans,* 153 U.S. at 594, 14 S.Ct. at 938.

▮ Neither of Ticktin's proposed instructions concerning the bonuses accurately stated the law. The district court did not err in refusing to give these instructions. In any event, the district court did instruct the jury on both board approval and official capacity as theories of Ticktin's defense. Ticktin was able to argue both these points to the jury. He was entitled to no more.

▮ The evidence was sufficient to convict Ticktin on all the misapplication counts concerning the bonuses. There was ample evidence for the jury to believe the government's theory that Ticktin embarked on a series of fraudulent schemes to keep Manning artificially alive and to believe that Ticktin was able to receive the bonuses because of his pattern of fraudulent conduct. This pattern supported an inference that Ticktin intended to defraud Manning when he accepted the bonuses. Moreover, each bonus was awarded to Ticktin at a time when he knew Manning had a negative net worth. The board was dominated by Ticktin's family, and Ticktin himself voted to grant the initial bonus. The board awarded the final two bonuses based on Ticktin's "fantastic" and "exemplary" work in turning Manning around and maintaining its profits, raising an inference that Ticktin deceived the board about Manning's true financial condition. In short, there was sufficient evidence for the jury to find that by accepting the bonuses Ticktin con-

verted Manning's funds to himself with the intent to defraud or injure Manning.

## B. *The Loan Counts.*

The jury convicted Ticktin on the other misapplication counts for five loans he made: a $260,000 loan to Olson, a $1,500,000 loan to Olson, $300,000 loans to Tuttle and Kehoe, and a $634,200 loan to Michael Kelley as part of the Forest Park transaction. The indictment alleged that the loans to Olson, Elliott, and Kehoe were unsecured or insufficiently secured. The indictment also alleged that Ticktin made the $1,500,000 loan to Olson for Ticktin's own benefit, and that Ticktin paid the proceeds of the loans to Tuttle and Kehoe over to Olson, and not the named borrowers. The indictment alleged that the loan to Kelley was secured by overvalued property, and that Kelley had not supplied a down payment for the loan.

▮ Ticktin submitted an instruction stating that it is not a misapplication for a bank officer to make a loan with little or no collateral. It is true that lack of collateral, by itself, does not make a loan a misapplication. Banks often make unsecured loans, based on the borrower's wealth, general creditworthiness, and other risk factors; increased interest compensates the lender for the increased risk involved. It would be an incredible and unjustified expansion of the misapplication statute to put bankers in jail simply for making unsecured loans.

But Ticktin's proposed instruction is incomplete and misleading. An unsecured or undersecured loan can be a misapplication, if made with the intent to defraud or injure the bank. *United States v. Kahn,* 381 F.2d 824, 832 (7th Cir.1967); *cf. Evans,* 153 U.S. at 592, 14 S.Ct. at 938 (discount of unsecured note is misapplication if made with intent to defraud). Ticktin's instruction would have focused the jury's attention solely on the lack of collateral and away from other facts from which the jury could have inferred an intent to defraud or injure Manning. Because Ticktin's proposed instruction did not accurately state

the law, the district court did not err in refusing to give it.

Ticktin also submitted an instruction that would have informed the jury that it is not a misapplication for a bank officer to make a loan knowing that the named borrower will turn the proceeds over to a third party, unless the officer knows that the named borrower will not or cannot repay the loan. Ticktin based this instruction on *United States v. Gens*, 493 F.2d 216, 222 (1st Cir.1974) and *United States v. Gallagher*, 576 F.2d 1028, 1045–46 (3d Cir. 1978). Those cases held that, "absent other circumstances," *Gens*, 493 F.2d at 222, it was not a criminal misapplication for a bank officer to loan money to one person knowing that the named borrower will pass the proceeds to other persons, except in three situations: where the bank officer knows the named borrower is either fictitious or unaware that his name is being used; where the bank officer knows that the named debtor will be unable to repay the loan; and where the bank officer assures the named borrower that he will not have to repay the loan. *Gens*, 493 F.2d at 221–22; *Gallagher*, 576 F.2d at 1046. This circuit has cited *Gens* and *Gallagher* in holding that merely loaning money to a named borrower for somebody else's benefit is not, absent more, a criminal misapplication. *United States v. Bruun*, 809 F.2d 397, 411–12 (7th Cir.1987); *see also United States v. Olson*, 825 F.2d at 123 (dictum); *United States v. Shivley*, 715 F.2d 260, 265 (7th Cir.1983) (dictum).

But Ticktin's proposed instruction concerning third-party loans was also incomplete and misleading. The instruction ignores the principle, clearly and repeatedly stated in this circuit, that when a bank officer makes a loan to a third party for the officer's own ultimate benefit he has made a criminal misapplication, regardless of the named borrower's intent or ability to repay the loan. *See, e.g., Olson*, 825 F.2d at 123; *Bruun*, 809 F.2d at 412; *Shivley*, 715 F.2d at 265. Ticktin claims that a third-party loan can never be a misapplication if the named borrower can and will repay it, but this circuit has never held

that. *See, e.g., Olson*, 825 F.2d at 123 ("*Without more*," such third-party loans to financially capable borrowers are not misapplications). (Emphasis added.) And *Gens* and *Gallagher* did not set out an exhaustive list of situations in which third-party loans could or could not be misapplications; *Gens* itself acknowledged that other circumstances could make such loans criminal misapplications. 493 F.2d at 222; *see also United States v. Kennedy*, 564 F.2d 1329, 1339 (9th Cir.1977). If all the facts and circumstances surrounding a particular loan indicate that a bank officer intended to defraud or injure the bank, then the jury may properly find that the loan was a criminal misapplication despite the named borrower's willingness and ability to repay it. The intent to defraud or injure the bank is what separates criminal misapplication from mere maladministration.

The evidence was sufficient to convict Ticktin for misapplication on all five loan counts. The first loan count involved a $260,000 loan to Olson. That loan was unsecured. The loan shortly followed the PDO transaction, and could be seen as a payoff for Olson's participation in that scheme. And two days later Olson loaned Ticktin $287,650 from Olson's First Suburban Bank of Maywood, secured by Manning shares (ten days after the ALJ had ordered Manning to increase its net worth or close down). It was a reasonable inference that the loan to Ticktin was in exchange for the loan to Olson. This inference is buttressed by the overall relationship between Ticktin and Olson, and by evidence of the fact that that relationship proceeded on an essentially *quid pro quo* basis—for example, Olson's demand that Ticktin pay him $50,000 to participate in the Forest Park scheme. Thus, the loan to Olson benefited Ticktin; it was a clever way for Ticktin to circumvent the regulations prohibiting him from loaning himself money from Manning.

The $1,500,000 loan to Olson was secured by Elgin Bancorp stock, stock that was worth little, if anything, as collateral. Olson used a substantial part of this loan to

pay off Ticktin's personal obligation at American National Bank. Although Olson had agreed to assume this obligation five days before receiving the loan, Ticktin had agreed to loan him the money before Olson assumed the obligation. The loan could thus be seen as one that benefited Ticktin by allowing himself to pay off a personal obligation with Manning's money.

The $300,000 loans to Kehoe and Tuttle arose out of the $1,500,000 loan to Olson. All or part of each loan went to pay part of the $1,500,000 loan that Olson had used, in part, to pay off Ticktin's obligation at ANB. Thus, these loans could be seen as part of a "complicated morass of clandestine financial dealings ... [that] ultimately inured" to Ticktin's benefit. *Olson*, 825 F.2d at 123. These loans were also secured by Elgin Bancorp stock, so these loans were also undersecured.

The indictment's final misapplication count charged that Ticktin misapplied Manning's funds by loaning $643,200 to Michael Kelley, one of the purchasers in the Forest Park deal. Kelley never met with a loan officer, and was paid $6,000 to participate in the transaction. Kelley also made no down payment on the condominiums he purchased. That in itself may not indicate any intent to defraud because it is not uncommon for bankers to loan 100 percent of the purchase price of a piece of real estate, based on the borrower's creditworthiness and other risk factors. Here, however, there was evidence that Ticktin never evaluated any of these factors before making the loan to Kelley. Moreover, Ticktin went out of his way to create the appearance of a 20 percent down payment for the Kelley loan and the other Forest Park loans, even though Manning never actually received any down payments. There was also evidence that the condominiums Kelley purchased were valued well above their market price, and that Manning financed more than the market price for the purchase.

■ We finally note that the government tried and argued the misapplications as part of its overall theory that Ticktin concocted several fraudulent schemes designed to bilk Manning of a substantial amount of its assets. We cannot view each misapplication count in isolation; instead, we must view the counts in light of Ticktin's overall course of conduct and in light of the fact that by convicting Ticktin on every count charged, the jury obviously believed the government's theory. Given this, it is difficult to believe that the jury would have convicted Ticktin on the misapplication counts unless it found that he intended to enrich himself at Manning's expense. Ticktin's convictions on the misapplication counts were proper.[5]

## VI.

### Alleged Erroneous Evidentiary Ruling

Ticktin finally contends that we must reverse his conviction on all counts because an evidentiary ruling by the district court deprived him of a fair trial. While questioning David Liebson, Manning's in-house attorney, the government's attorney asked Liebson how Ticktin billed the legal services that Liebson performed for Olson at Ticktin's request. Liebson answered that Ticktin billed those services under the letterhead of Ticktin's private law firm. Ticktin's counsel immediately objected, but the

---

**5.** On both the loan and bonus counts, Ticktin rather obliquely seems to argue that the indictment did not state offenses. His opening brief mentions the allegations in the indictment but focuses its argument on the sufficiency of the evidence and the jury instructions. His reply brief is more forthright in arguing that the indictment did not state offenses but it does not discuss the applicable standards for determining an indictment's sufficiency. Assuming Ticktin has properly presented the issue, we hold that the misapplication counts sufficiently stated offenses. Each count alleged that Ticktin was an officer of Manning, that Manning was federally insured, that Ticktin willfully misapplied Manning's funds and how he misapplied those funds, and that Ticktin acted with the intent to injure or defraud Manning. *See United States v. Broome*, 628 F.2d 403, 405 (5th Cir.1980) (per curiam).

Ticktin also argues that reversing any substantive misapplication count requires us to reverse the conspiracy counts as well. Because we affirm the substantive misapplication counts, we do not reach this argument.

district court refused to strike Liebson's answer.

On appeal, Ticktin argues that the district court abused its discretion by not striking Liebson's answer and allowing the government to ask further questions about the billing arrangement (eliciting the same information). According to Ticktin, Liebson's testimony was "other acts" evidence under Fed.R.Evid. 404(b) that the district court should not have admitted because the government failed to disclose the evidence before trial. Ticktin also asserts that the evidence was irrelevant to any issue in the case, and unduly prejudicial to him.

 Rule 404(b) prohibits evidence of other acts "to prove the character of a person in order to show action conforming therewith." Assuming that Liebson's testimony about the billing was Rule 404(b) evidence, its admission was not reversible error. For one thing, the evidence was admissible. The testimony was relevant to the conspiracy count and other counts involving Ticktin and Olson because it showed the nature of the relationship between them. Any potential for unfair prejudice to Ticktin was minimal at best. Liebson's response was an isolated piece of testimony from a trial that lasted almost four weeks, and the government never argued or presented evidence to show that the billing arrangement was improper. And even if the admission of the evidence violated the district court's prior disclosure order, Ticktin has not mentioned how that violation affected his defense or prejudiced him in any way. *See* Fed.R.Evid. 103(a).

## VII.

### Conclusion

For the reasons stated above, we RE-VERSE Kehoe's, Bailey's, and Lang's convictions. We also REVERSE Ticktin's convictions on Counts Five, Six, and Seven (the Orland Park mail fraud counts). We AF-FIRM Ticktin's convictions on all other counts. We REMAND to the district court with instructions to enter judgments of acquittal on all reversed convictions, and to resentence Ticktin on his remaining convictions.