UNITED STATES of America, Plaintiff,

v.

Robert H. PATTERSON, Defendant.

No. 86 CR 350-2.

United States District Court,
N.D. Illinois, E.D.

May 25, 1988.

Joseph J. Duffy, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Joseph A. Lamendella, Lamendella & Filosa, Chicago, Ill., for Mitchell.

Jerome Rotenberg, Rosenfeld Rotenberg Schwartzman Harton & Shapiro, Chicago, Ill., for Patterson.

Mitchell Caplan, Chicago, Ill., for Cosentino.

Michael T. Mason, Asst. Federal Defender, Chicago, Ill., for Goepfert.

Thomas P. Sullivan, Jenner & Block, Chicago, Ill., for Hayne.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On October 1, 1986 after a bench trial, this Court found defendant Robert Patterson guilty on eight counts of mail fraud for his participation in scheme to misappropriate premiums from the Kenilworth Insurance Company ("Kenilworth"). Patterson was sentenced to the custody of the Attorney General for a period of eighteen months, fined $7,000 and placed on probation with certain special conditions. On December 11, 1986 this Court reduced Patterson's incarceration period to fourteen months. Presently before the Court is an Order on remand from the Seventh Circuit to consider Patterson's motion to vacate judgment of conviction and sentence in light of *United States v. McNally,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) and *United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987). Because we conclude that there is no reason to vacate Patterson's conviction and sentence in light of *McNally* and *Gimbel,* we deny Patterson's motion.

*Facts*

The indictment sets out a scheme utilized to manipulate the safeguards of Illinois insurance law in order to loot a premium trust account of an insurance company. Illinois statutes and regulations prohibit the misapplication or conversion of insurance premiums held by an insurance agent or broker in a fiduciary capacity. Illinois law also prohibits the sale or exchange of stock of an insurance company without the approval of the Director of the Department of Insurance ("Department") and precludes the execution of an exclusive agency agreement by an insurance company without the approval of the Director of the Department. These regulations assist the Department in protecting the individual insured from the activities of an unscrupulous insurance company which could just abscond with the premiums.

Kenilworth was a duly authorized Illinois Insurance Company. It had, historically, been a substandard automobile insurance company. By 1981, however, it was in a precarious financial situation. Because of this, the Department, in closely monitoring the company, required Kenilworth to submit quarterly financial information.

In an effort to remedy Kenilworth's financial plight, Kenilworth's president, Chester Mitchell, sought to expand Kenilworth's charter to allow the company to also underwrite property and casualty insurance. In the course of these efforts to expand Kenilworth, defendants Patterson and Joseph Consentino, Sr., became involved with Kenilworth. Patterson, in turn got Alan Assael and Jack Goepfert involved in Kenilworth. Goepfert indicated that he could produce $20 million in business for Kenilworth.

On November 28, 1981, Goepfert, Consentino, Mitchell and Patterson met in Chicago to discuss the split of profits from the business. This meeting resulted in a handwritten agreement drafted by Mitchell and signed by the parties wherein they were all to have equal ownership in and right to profits from certain entities including Kenilworth, annual salaries of $200,000, and

certain additional remuneration to go to Mitchell.

The plan, proposed by Goepfert, to revitalize Kenilworth, involved appointing agents and writing a significant amount of liability and property insurance which would be reinsured through another source and directing all the business through a managing general agency to be set up for Kenilworth. After the November 28, 1981 meeting, a managing general agency agreement for Kenilworth was drafted. Normally, a managing general agency for an insurance company is an agency with expertise in a particular insurance field and which handles that particular type of insurance for the company. Here, however, the entity used as the managing general agency for Kenilworth was Robco, a dormant agency in Patterson's name, and it was decided that *all* of the Kenilworth insurance would be written through Robco. The reason for this arrangement was to siphon off money from Kenilworth without the Department being able to stop it. With a managing general agency agreement, a commission could be deducted from all business written on behalf of the insurance company. If the money went directly to Kenilworth it would have been scrutinized more carefully by the Department than money taken out of the managing general agency. Or, as stated by Assael at trial, the importance of Robco as the managing general agency was to "shortstop" premium money from going to Kenilworth. The money taken in through Robco was to be split equally between Goepfert, Cosentino, Patterson and Mitchell.

There was another purpose of the managing general agency agreement and that was to allow Kenilworth to write far more insurance than it had surplus on the books to justify. The agreement allowed Robco to withhold from Kenilworth all premium money and claims so that Kenilworth in turn could avoid reporting this information to the Department. If Kenilworth had reported all this new business without sufficient reserves, the Department would have come in and shut Kenilworth down as insolvent, which it eventually did when this scheme came to light.

Therefore, by manipulating Illinois insurance law requirements, the schemers were able to misappropriate Kenilworth insurance premiums from Robco's premium trust account. A premium trust account is used as a depository for premiums collected by an agent or broker on behalf of an insurance company. The purpose of the account is to ensure that an agent or broker accounts for the premiums that he receives and remits the premiums to the insurance company. The agent or broker acts as a trustee with respect to the account. Money may be withdrawn from a premium trust account for only two reasons: To remit the premium money to the insurance company or to withdraw the agent or broker's lawful commission derived from generating the premiums. If a managing general agent feels that he is entitled to commissions on business other than that in the premium trust account, the agent must seek other means to obtain that money; he may not withdraw it from the premium trust fund account.

Under the Kenilworth/Robco agency agreement, premium money was to be deposited in a Robco premium trust account and then remitted to Kenilworth less commissions. Because Robco's commission rate was 30%, all other premiums should have been turned over to Kenilworth as they were Kenilworth's property. It was Patterson's defense, which this court rejected, that Robco was entitled to all of the premiums it brought in as compensation for commissions on business sold by other agents.[1]

So, in general, the scheme allowed the parties to funnel insurance business to Kenilworth through Robco and split 100% of the premiums. This, of course, was in violation of Illinois law which prohibited withdrawals from Robco's premium trust account other than for commissions (here 30%) or to pay Kenilworth. Patterson's justification for taking all the premiums immediately was that the group planned to secure 100% reinsurance of all Kenilworth policies so they had anticipated that the

premiums would eventually be surplus. This, of course, ignored the law. If defendants tried to do this with Kenilworth directly, they would not have gotten far because the Department would have stopped it immediately. Thus, Robco was needed so they could execute their plan without the Department's scrutiny.

The Department normally would have brought this scheme to an end before it ever got going if its regulations had been followed. But keeping the Department in the dark was a key component of the scheme. Not only would the Department have scrutinized the withdrawals from the premium trust account, but had the handwritten ownership agreement been filed, as required under Illinois insurance law, the Department would have disapproved the agreement. And, if the Department knew that Goepfert and Assael were involved with Kenilworth, the Department would shut down the operation immediately. This was because both had criminal fraud charges pending against them in New York. Thus, the necessity of not filing the handwritten agreement as required by law for Department of Insurance approval.

After the Department shut Kenilworth down in April, 1982, the Robco premium trust account was audited. The audit showed a significant increase in premium account funds beginning in December, 1981 and continuing until April, 1982 when Kenilworth was closed down. The audit determined that Robco received approximately $285,000 in premium money on Kenilworth policies, and, only two payments totaling $20,308 were actually remitted to Kenilworth. The auditor traced the flow of the premium money and then found that the premiums received by Robco were deposited in Robco's premium trust account and then approximately 90% were withdrawn and deposited into general operating accounts controlled by Patterson. Patterson then disbursed this money to various individuals and for office expenses. He did not send any of it to Kenilworth, although by law, everything above the 30% commis-

---

1. This was also contrary to Illinois insurance law which deemed all premiums in the trust account less lawful withdrawals the property of Kenilworth. *See,* 50 Ill.Ad.Code § 3113.40(i).

sion was Kenilworth's. Although Patterson claimed that he never drew his salary of $2,000 per week, he also told his bookkeeper to keep track of this weekly amount and he would consider that amount to be a credit against his account. Patterson admitted that he suspected that he eventually would have asked for this money from Kenilworth.

### Motion to Vacate

In *McNally v. United States*, the Supreme Court held that the mail fraud statute is "limited in scope to the protection of property rights," and that it does not proscribe schemes to defraud individuals or entities of intangible rights. — U.S. —, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987).[2] Before the Supreme Court decided *McNally*, the mail fraud statute was routinely used to prohibit schemes that deprived people of intangible rights. "In the public sector, judges, state Governors, chairmen of state political parties, state cabinet officers, city aldermen, congressmen and many other state and federal officials have been convicted of defrauding citizens of their right to the honest services of their governmental officials." *McNally*, 107 S.Ct. at 2883 and n. 1 (Stevens, J., dissenting). "In the private sector, purchasing agents, brokers, union leaders, and others with clear fiduciary duties to their employers or unions have been found guilty of defrauding their employers or unions by accepting kickbacks or selling confidential information." *Id.* at 2883 and n. 2 (Stevens, J., dissenting).

The intangible rights were not a form of property, but the product of a fiduciary trust with the people to perform whatever duties were entrusted in those accused in a faithful, honest, and impartial manner. Subsequent to *McNally*, the Supreme Court in *dicta*, indicated that a scheme to defraud an employer of "its contractual right to his honest and faithful service" was "an interest too ethereal in itself to fall within the protection of the mail fraud statute...." *Carpenter v. United States,* — U.S. —, 108 S.Ct. 316, 320, 98 L.Ed. 2d 275 (1987).

### The Indictment and Evidence Presented

■ Patterson was charged in part with abusing the fiduciary trust of Kenilworth by failing to perform his duties "free from dishonesty, misconduct, fraud, and conflict of interest, and concealment of material facts...." (Indictment ¶ 10.a.1). The indictment also charged him with a scheme to defraud the "Illinois Department of Insurance and the State of Illinois of their right to be fully informed and advised of the business operations of Kenilworth...." (Indictment ¶ 10.b.).

If these were the only charges in the indictment, it would probably fail to state an offense under the mail fraud statute. *See United States v. Eckhardt,* 843 F.2d 989, 996–97 (7th Cir.1988) (charge in indictment that defendant interferred with IRS's proper ascertainment and collection of income taxes without charging that the government was deprived or revenue fails under *McNally* ). *Accord United States v. Holzer,* 840 F.2d 1343 (7th Cir.1988); *United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987). However, here the indictment also alleges that a goal of the scheme was "[t]o obtain money by means of false and fraudulent pretenses and representations," (Indictment ¶ 10.c.), and that "[i]t was the

---

**2.** The mail fraud statute, 18 U.S.C. § 1341 states the following:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

scheme of the defendants to utilize and operate Kenilworth for the purpose of obtaining money by improperly converting to their use Kenilworth insurance and bond premiums." (Indictment ¶ 11). This language adequately charges that a goal of this scheme was to deprive Kenilworth of more than the intangible right to the honest and faithful services of the defendants or the Department of Insurance of information.

■ Moreover, the proof at trial adequately established that a goal of this scheme was to siphon off the premium money from Kenilworth. Patterson argues that the Government did not pursue this case on the theory that the scheme involved the misappropriation of Kenilworth premiums. We disagree. First, the indictment clearly charges that this was a scheme to misappropriate the premiums. Paragraph 3 of the indictment sets forth various Illinois laws, the *first* states that Illinois law "[p]rohibited the misapplication or conversion of insurance premiums held by an insurance agent or broker in a fiduciary capacity...." The indictment also states "[i]t was the scheme of the defendants to utilize and operate Kenilworth for the purpose of obtaining money by improperly converting to their use Kenilworth insurance and bond premiums." The Government presented a substantial amount of evidence concerning the misappropriation of the premiums, especially the testimony of Larry Nora who conducted the audit of Robco's premium trust account. The Government clearly argued in its opening and closing arguments that setting up Robco as the managing general agent was a way to get the money before it ever got to Kenilworth. *See, e.g.,* Tr. 6, 9, 809, 816, 817, 852, 857, 861.

There was certainly a great deal of argument and evidence concerning the duty defendants owed to Kenilworth, to the Illinois Department of Insurance, and to the policyholders. However, in addition to proving a scheme to defraud the Department of information and Kenilworth of the loyal services of its employees, this evidence was relevant to prove intent to commit the fraudulent scheme. Misappropriation of the insurance premiums in and of itself would not be criminal under the mail fraud statute. It is with the specific intent to defraud that the misappropriation becomes criminal. *See United States v. Goss,* 650 F.2d 1336, 1346 (5th Cir.1981); *United States v. McDonald,* 576 F.2d 1350, 1359 n. 14 (9th Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed. 2d 124 (1978). The Government amply proved the specific intent to defraud, in large part, by showing the blatant manipulation of the reporting requirements and the abuse of trust.

Patterson apparently realizes that the misappropriated premiums are sufficient to satisfy *McNally,* because he goes to great lengths to explain away the misappropriations in his reply brief:

The premium money retained by Robco was an offset against commissions due Robco as a result of premium moneys paid directly by agents to Kenilworth on which Robco had a right to commissions. Furthermore these money were retained by Robco with the permission of Kenilworth. Although the retentions might *have technically been in violation of the statute relating to premium trust funds,* the retention was not a fraud upon Kenilworth because Kenilworth had knowledge of and acquiesced in the manner premiums received by Robco were handled.

Furthermore, Kenilworth did not sustain any monetary loss as a result of the manner in which premium moneys flowed through Robco because of the many millions of dollars of premium money that was paid directly to Kenilworth by agents and on which Robco was entitled to commissions which it never received.

(Reply at 13). We rejected these same arguments at trial and we again reject them now. Illinois law provides that any unlawful withdraw from a premium trust account is a misappropriation of the insurance company's funds. Illinois established this law to protect policyholders from just the type of unscrupulous conduct present in this case. All withdrawals in excess of

Robco's 30% commission on insurance *it wrote* were misappropriations of Kenilworth's premiums. Therefore, we reject Patterson's argument to the contrary and conclude that the indictment clearly charged and the evidence presented clearly demonstrated a scheme to misappropriate property, specifically Kenilworth's insurance premiums.[3]

### This Court's Oral Finding

■ Patterson pulls out of context some comments this Court made during his attorney's closing argument and in delivering its findings of guilt and contends this proves that this Court did not find defendants had conspired to defraud Kenilworth of a property interest. Under Fed.R.Crim.P. 23(c), the court need only make a general finding and only upon request, find the facts specially. There was no request by either defendant for a finding of the facts specially. Therefore, this Court gave a general finding of guilt and did not intend that its "very brief remarks" should have been taken as a special finding. Because there seems to be no time limit under Fed.R. Crim.P. 23(c) as to the findings issued by a judge, the Court sets forth the following findings. *Cf. United States v. Brown,* 716 F.2d 457, 462 (7th Cir.1983) (proceedings remanded to district court judge to make written findings of fact on issue necessary to convict); *United States v. Pinner,* 561 F.2d 1203, 1207 (5th Cir.1977) (proceedings remanded to a district court judge to make specific written findings); *United States v. Ogden,* 484 F.2d 1274, 1275 (9th Cir.1973), *cert. denied,* 416 U.S. 487, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974) (findings of fact issued subsequent to sentencing complied with Rule 23(c)). Although a great deal of time has passed since this case was tried, this Court has had an opportunity to refresh its memory by reviewing the transcript of the trial. Accordingly, the Court sets forth the following findings of fact on the issue of whether a victim of this scheme was fraudulently deprived of a property right. *Cf. Ingber v. Enzor,* 841 F.2d 450, 452 (2nd Cir.1988) (in rejecting defendant's *McNally* challenge to District Judge's finding of guilty, the Second Circuit relied in part upon a clarification of the judge's trial findings issued subsequent to his initial findings).

This Court finds that one of the goals of defendants' scheme was to misappropriate Kenilworth Insurance Company premiums. Although this Court also concluded that defendants had deprived the Illinois Department of Insurance of its intangible right to be fully informed and that the policyholders in turn were deprived of that regulation, it also concluded that Kenilworth Insurance Company was a victim of this scheme when its premiums, which were held in trust by Robco, were unlawfully withdrawn and disbursed in further-

**3.** In the Seventh Circuit's most recent *McNally* case, it affirmed an order setting aside the mail fraud conviction of an attorney convicted under the Greylord investigation. *Ward v. United States,* 845 F.2d 1459 (7th Cir.1988). In *Ward,* the Seventh Circuit concluded that on appeal the government had identified a property right which, if actually presented at trial, would have supported a mail fraud or wire fraud prosecution. However, the government "failed to present facts showing that the scheme to defraud actually involved that property right." *Id.* at 1463. It could be argued that, because the government brought this case in part on the theory that the scheme was to defraud the Department of information and Kenilworth of faithful services, *Ward* would require that Patterson's conviction be vacated. Nevertheless, we do not believe that would be a successful argument. As the Seventh Circuit indicated in *Ward:* "The root difficulty of the government's case is not that the case went to the jury on a completely different theory from the one argued in the [Seventh Circuit] but that the theory now pressed has no support in the record." *Id.* at 1463. Unlike *Ward,* in this case, deprivation of a property right, misappropriation of Kenilworth's premiums, was charged in the indictment and proved at trial by, *inter alia,* Larry Nora's testimony. Nora conducted the audit of the premium trust account Robco had for Kenilworth's premiums. Nora testified that Patterson unlawfully withdrew money out of the premium trust account, and that money which legally belonged to Kenilworth was funneled through Robco's general operating account and then disbursed to various individuals to pay expenses. Thus, although this case was in part about defrauding the Department of information and Kenilworth of faithful services, it was also about "improperly converting to [the defendants'] use Kenilworth insurance and bond premiums." (Indictment ¶ 11).

ance of this scheme. This Court also found that the mailings of the premium checks to Robert Patterson as set forth in Counts I–VIII were all in furtherance of this scheme because without the premiums, there would have been no money to misappropriate.

### Conclusion

The indictment in this case properly charges defendant Robert Patterson with a scheme to defraud the Kenilworth Insurance Company of its premiums. The Government argued this scheme at trial and presented ample evidence of this scheme at trial. The Court also found that Patterson had indeed participated in the scheme to misappropriate Kenilworth premiums, and that Kenilworth was indeed a victim of this scheme in that it was defrauded of its insurance premiums held in trust by Robco. Accordingly, defendant Robert Patterson's motion to vacate his judgment of conviction and sentence is denied.[4] It is so ordered.

Agustin G. Garcia, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., James J. Kubik, Asst. U.S. Atty., for defendant.

---

**4.** Patterson's co-defendant, Joseph Consentino, filed a "motion to adopt" in which he moved to adopt Patterson's briefs and arguments in this motion but made no arguments of his own. Accordingly, we also deny Consentino's motion to vacate.