**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph R. COSENTINO, Sr. and Robert
H. Patterson, Defendants–Appellants.**

Nos. 86–3090, 86–3098.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 28, 1988.

Decided Feb. 8, 1989.

Rehearing and Rehearing En Banc
Denied March 22, 1989.

Mitchell H. Caplan, Jerome Rotenberg, Rosenfeld, Rotenberg, Schwartzman, Hafron & Shapiro, Chicago, Ill., for defendants-appellants.

Matthew R. Bettenhausen, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

We visit once more the issue of "intangible rights" raised by mail fraud cases in the wake of the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). After a number of years during which the government successfully prosecuted defendants under the mail fraud statute for depriving people of "intangible rights," the Supreme Court ruled in *McNally* that a deprivation of intangible rights alone could not support a conviction for mail fraud under 18 U.S.C. section 1341. *Id.* 107 S.Ct. at 2881 ("We read § 1341 as limited in scope to the protection of property rights."). As a result, defendants like those in the case before us who were convicted under the intangible rights theory now seek to have their convictions vacated.

The defendants in this case, Cosentino and Patterson, were originally convicted in a bench trial before Judge Aspen. While their case was on appeal, this court ordered it remanded for other reasons and then extended the order of remand to include reconsideration in light of *McNally*. On remand, Judge Aspen made supplemental findings of fact, and ruled that the scheme in this case involved a property right sufficient to sustain the convictions under *McNally*, 690 F.Supp. 647. Defendants appeal. We affirm.

## I.

### A.

In reviewing the facts, we take all evidence and inferences in the light most favorable to the government's case. *United States v. Goudy*, 792 F.2d 664, 674 (7th Cir.1986). The case centers on the Kenilworth Insurance Company ("Kenilworth"), an insurance company that originally dealt in substandard automobile insurance. This specialty did not generate great profits for the company, and by 1981 the company was so thinly capitalized that it was required by the Illinois Department of Insurance (the "Department") to submit special quarterly reports on its financial condition.

The president and majority owner of the company, Chester Mitchell, made a number of efforts to save his company, expanding beyond substandard auto insurance over the protests of Kenilworth's minority own-

er, Milt Law. The first of these efforts took Kenilworth into the business of bond guarantees in 1981 with the help of defendant Cosentino, who met Mitchell after hearing through a mutual friend that Kenilworth might be interested in expanding into new lines of insurance. Through Cosentino, Mitchell also met defendant Patterson, who with his wife owned an insurance brokerage firm named Robco Worldwide Facilities, Inc. ("Robco"). In 1981 Mitchell entered into an agreement with Patterson that Robco would now place property and casualty insurance business with Kenilworth.

Patterson subsequently introduced Mitchell and Cosentino to Alan Assael and Jack Goepfert, who also had backgrounds in the insurance business. Assael, whom Patterson had originally known under another name, was at that time under indictment in the Southern District of New York for conspiracy and mail fraud-charges to which he subsequently pleaded guilty. By 1981 Goepfert had been convicted on felony charges in the U.S. District Court in the Eastern District of Pennsylvania, and subsequently pleaded guilty to charges filed against him in the Southern District of New York.[1] In 1981 Assael was employed by Goepfert as an underwriter. In a meeting attended by Patterson, Goepfert and Assael at the Newark Airport in the summer of 1981, Patterson mentioned Kenilworth's interest in obtaining new business, and Goepfert represented to Patterson that he could produce $20,000,000 in business for Kenilworth.

As a result of this exchange at the Newark meeting, there ensued a series of meetings in Chicago that included Patterson, Cosentino, Assael, Goepfert and Mitchell. During the course of these meetings, Assael and Goepfert indicated that the Department of Insurance was unlikely to countenance their involvement in any planned business venture because of their past legal difficulties and discussed ways in which their involvement could be concealed from the Department. The meetings culminated in a handwritten agreement dated November 28, 1981, detailing a new business arrangement involving Cosentino, Patterson, Goepfert and Mitchell. The agreement provided that all of the parties were now to have equal ownership in and rights to profit from Kenilworth and Robco.[2] Robco would serve as a managing general agency through which all of Kenilworth's business would be handled. The parties were also to receive annual salaries of $200,000, with some additional payments to Mitchell in view of the fact that he "had put a great many years of his life into [Kenilworth]." Record at 54. All four men provided that their ownership interests were to be listed in the names of their wives or children, to obscure their involvement in the arrangement. Although the Illinois Insurance Code requires that the Illinois Department of Insurance be notified of changes in ownership and control of insurance companies, Ill.Rev.Stat. ch. 73, ¶¶ 743.1, 743.4, 753, 753.1 (1981), none of the parties to this agreement filed it with the Department.

In January of 1982 Goepfert drew up a managing general agency agreement governing the relationship between Robco and Kenilworth, a contract which once again was not filed with the Department. Using Robco as a managing general agency permitted the parties more latitude, because

---

1. Assael and Goepfert both served sentences for these earlier crimes. Both men were apparently cooperating with the government in this case. Assael was granted immunity as to his involvement in the activities at issue here. Goepfert's sentence on his earlier convictions was reduced in return for his cooperation; he pleaded guilty in this case.

2. Kenilworth's minority owner, Law, had been bought out in September of 1981 by Cosentino, who had his son sign the purchase agreement because he himself was at that time under investigation. In January of 1982 this first agreement was replaced by a contract that substituted Mitchell for Cosentino as the purchaser, evidently because Mitchell was concerned about the investigation involving Cosentino at the time. However, although Mitchell's name was substituted, the down payment came from Cosentino, and the remaining funds were provided by a third party, Barry Toomey. The contract between Law and Mitchell was duly filed with the Department as required by the Illinois Insurance Code for any change of ownership or control of an insurance company. Ill.Rev.Stat. ch. 73, ¶¶ 743.1, 743.4, 753, 753.1 (1981).

the Illinois Department of Insurance did not monitor the funds flowing to agencies like Robco as closely as it did funds going to insurance companies like Kenilworth. (In any case, Kenilworth, as noted above, was at the time under particularly close scrutiny because of its marginal financial condition.) Robco held Kenilworth's funds in a "premium trust account," from which it could withdraw money for commissions. Under the January agreement, Robco was entitled to a 30% commission, an amount which an official from the Department testifying at the trial characterized as "excessive." Record at 263. Robco actually withdrew approximately 90% of the funds in the trust account, thereby exceeding the already generous commission fee to which it was entitled. *United States v. Patterson*, 690 F.Supp. 647, 650 (N.D. Ill.1988). Patterson subsequently disbursed the money he obtained from the premium trust account to Mitchell's son, Cosentino's wife, Goepfert's wife and Assael's wife. He also used the money to pay office expenses. He himself did not withdraw money for his salary, but he told the bookkeeper to credit him $2,000 per week in salary. He later admitted that he would probably have eventually attempted to collect that money. The small percentage of the trust account funds that was remitted to Kenilworth evidently went to pay that company's expenses.

The managing general agency agreement with Robco not only permitted increased flexibility in withdrawing funds that properly belonged to Kenilworth, but also allowed Kenilworth to delay reporting its new business to the Department. Kenilworth thereby succeeded in writing much more insurance than was justified by its then-existing surplus, without alerting the Department to its increasingly insolvent condition. Eventually, despite efforts to reinsure these new policies through a British insurance agency, Kenilworth could no longer avoid the inevitable showing of insufficient surplus, and the Department closed it down in April of 1982.

### B.

Cosentino and Patterson were indicted and convicted on eight counts of mail fraud. The indictment charged them and their co-defendants with scheming to defraud Kenilworth, its policyholders and claimants, the Illinois Insurance Guarantee Fund and its member companies, the Illinois Department of Insurance and the State of Illinois of their right to have Kenilworth's business conducted honestly. The indictment further charged them with participating in a scheme "[t]o obtain money by means of false and fraudulent pretenses and representations," and went on to describe the way in which the defendants planned to "utilize and operate Kenilworth for the purpose of obtaining money by improperly converting to their use Kenilworth insurance and bond premiums." Appendix of Appellant Cosentino at 13. The rest of the indictment contained further references to specific financial transactions in which Kenilworth's funds were used improperly. The indictment also noted the steps taken by the defendants to conceal their actions from the Illinois Department of Insurance.

Both men were convicted following a bench trial before Judge Aspen. During closing argument, Patterson's counsel attempted to address the part of the indictment that charged Patterson with scheming to obtain money by means of false and fraudulent pretenses and representations:

DEFENSE COUNSEL: Then we go to the last one, which was to obtain money by means of false and fraudulent pretenses and representations. And this record is silent as to any misrepresentations or fraudulent pretenses or representations.

And as far as the obtaining of money is concerned here, where did that money come from? It came from policyholders and-

THE COURT: I don't think the government has even argued that particular fraud, so-

DEFENSE COUNSEL: They are conceding that it wasn't there.

THE COURT: So I think for the purposes of this argument, you do not have to go through that.

DEFENSE COUNSEL: All right.

Record at 838. In finding the defendants guilty as to the eight mail fraud counts, Judge Aspen commented:

The defense in this case is essentially a good faith defense. In light of all the circumstantial evidence but particularly in light of the defendants' sophistication in the insurance business, that defense is not persuasive.

Appendix of Appellant Cosentino at 25.

At the subsequent sentencing hearing, Judge Aspen sentenced Cosentino to the custody of the Attorney General for nine months on Count I, and then to five years' probation on the remaining counts. The court additionally required that Cosentino serve three thousand hours in community service, and that he be prohibited from working in the insurance industry during his probation. Judge Aspen sentenced Patterson to the custody of the Attorney General for eighteen months on Count I[3] and five years' probation on the remaining counts, to be served consecutively. The court also fined Patterson $1,000 on each of the eight counts, and required that Patterson continue to receive psychological therapy, perform one thousand hours of community service, divest any remaining interests in the insurance industry and refrain from working in the insurance industry.

This court remanded the defendants' original appeal and ordered consideration of the defendants' motions to vacate their convictions and sentences in light of *McNally.* Judge Aspen denied the defendants' motions and issued supplemental findings of fact:

This Court finds that one of the goals of defendants' scheme was to misappropriate Kenilworth Insurance Company premiums. Although this Court also concluded that defendants had deprived the Illinois Department of Insurance of its intangible right to be fully informed and that the policyholders in turn were deprived of that regulation, it also concluded that Kenilworth Insurance Company was a victim of this scheme when its premiums, which were held in trust by Robco, were unlawfully withdrawn and disbursed in furtherance of this scheme.

*United States v. Patterson,* 690 F.Supp. 647, 652 (N.D.Ill.1988).

In this appeal both defendants raise *McNally* challenges to their convictions. They also challenge the sufficiency of the evidence in a number of respects. In addition, Cosentino objects to Judge Aspen's supplemental fact-finding on remand as "double jeopardy." Patterson urges that the court's decision to sentence him more harshly than the other defendants constituted an abuse of discretion.

## II.

### A.

We consider first the defendants' *McNally* challenge to their convictions. *McNally* held that the mail fraud statute protects property rights, but not intangible rights such as the "right of the citizenry to good government." 107 S.Ct. at 2879. In *McNally* state officials arranged to have the state's insurance business funneled through designated agencies, which in turn redistributed excess commission money to the officials and their business partner. The defendants in *McNally* were convicted of defrauding the citizens and state government of their right to have state business conducted honestly, and for scheming to obtain money and things of value through false pretenses and concealment. *Id.* at 2878. The Court, noting that "the jury was not required to find that the Commonwealth itself was defrauded of any money or property," held that the indictment and jury instructions "permitted a conviction for conduct not within the reach of § 1341." *Id.* at 2882.

■ In *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court gave further guidance as to what kind of property would meet the test set out in *McNally.* The property at issue in *Carpenter* was confidential securities information, which although admitted-

---

**3.** The court later reduced this period to fourteen months.

ly "intangible" in character nonetheless met the *McNally* test. *Id.* 108 S.Ct. at 320. The Court accordingly upheld the *Carpenter* defendant's conviction for depriving the Wall Street Journal of its right to exclusive use of the confidential information in question. Thus a deprivation of "intangible" *property* violates the mail fraud statute, but a deprivation of intangible rights (such as the right to good government, the right to honest administration of the justice system, etc.) does not.

■ This court has applied *McNally* and *Carpenter* to uphold a number of convictions which were originally obtained under the intangible rights theory. In *United States v. Wellman,* we upheld the conviction of a defendant who conveyed fraudulent information regarding the chemical shipping tanks he sold. 830 F.2d 1453 (7th Cir.1987). The defendant in *Wellman* was charged both with defrauding the buyer of "its right to have safe and authorized equipment for the storage and shipment of hazardous chemicals," and with obtaining money "by means of false and fraudulent pretenses." *Id.* at 1463. The jury instructions permitted the jury to convict if it found the defendant guilty of either of these charges. Thus it was possible that the conviction rested upon a deprivation of the buyer's intangible right ("to have safe and authorized equipment") alone. However, the *Wellman* court looked "to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense." *Id.* at 1462. Even though the indictment and jury instructions used intangible rights language, the court observed that "[t]he legal characterization the indictment places on the scheme should not obscure the fact that the specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute." *Id.* The court concluded that it did not matter on which part of the indictment the jury had based its conviction, because both alleged identical conduct—the fraudulent sale of tanks using false representations. This conduct was clearly the kind of "garden variety" fraud prohibited by the mail fraud statute, involving a planned deprivation of property. *Id.* at 1463.

The *Wellman* approach has been utilized in several subsequent Seventh Circuit cases. In *United States v. Bonansinga,* for example, the court looked "beyond the face of an indictment" that used intangible rights language and upheld the conviction of a public servant charged with procuring paint and auto supplies with public funds for his personal use. 855 F.2d 476, 479–80 (7th Cir.1988). The underlying scheme charged in *United States v. Bailey,* 859 F.2d 1265 (7th Cir.1988), similarly involved conduct clearly proscribed by the mail fraud statute—defrauding a bank of its assets. In both *Bailey* and *Bonansinga,* the indictments, jury instructions and evidence at trial all indicated that the underlying scheme involved conduct prohibited by the mail fraud statute—that is, a deprivation of money or property. Thus in order to convict the defendants of the schemes alleged, the jury *necessarily* had to convict them of scheming to deprive the alleged victims of property. *See also Moore v. United States,* 865 F.2d 149 (7th Cir.1989) (scheme to deprive sanitary district of bid money necessarily involved both deprivation of money and deprivation of public's right to honest and loyal service); *United States v. Folak,* 865 F.2d 110 (7th Cir.1988) (scheme to deprive county of funds from seizure warrants necessarily involved both deprivation of money and public's right to honest and faithful service).[4]

---

4. In cases in which two distinguishable schemes were alleged, one involving property and the other involving intangible rights, this court has taken different approaches. In *United States v. Eckhardt,* this court held that the portions of the indictment that charged the defendant with intangible rights violations were "easily separable" from the portions alleging a scheme to deprive victims of property, and thus were "mere sur-

plusage" that failed to "taint the remainder of the indictment." 843 F.2d 989, 997 (7th Cir. 1988). In *United States v. Cooke,* this court vacated the defendant's convictions as to counts of the indictment that charged intangible rights violations only, and upheld his convictions on counts that charged deprivations of property. 833 F.2d 109, 111 (7th Cir.1987). In the case before us this problem does not arise, because

Similarly, in the case before us, the scheme to deprive Kenilworth and its policyholders and claimants of their "right to the conscientious, loyal, honest, faithful and impartial services, decisions, actions, and performance of duties" by the defendants was also the scheme that deprived Kenilworth of sound financial management. The two schemes are one and the same, and both allege conduct prohibited by the mail fraud statute—conduct that bled Kenilworth of needed money and permitted it to write more insurance than it should have. Further, in misleading the Department of Insurance, the scheme permitted the agency to remain in business past the point it would have had the Department been aware of the defendants' activities—and that additional time allowed the defendants more time to take Kenilworth's money from the Robco account.

This case closely resembles *United States v. Bailey*, 859 F.2d 1265 (7th Cir. 1988), which involved a scheme to deceive the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC") about the declining assets of a bank. Like Kenilworth, the bank in *Bailey* was already in trouble and subject to additional scrutiny by a regulatory agency. The scheme in *Bailey* gave the defendants additional time to bilk the bank of assets it badly needed. In this case, Kenilworth's already precarious financial position was made worse because the defendants were able to deceive the Department of Insurance about Kenilworth's situation and keep the agency open longer, as more and more assets disappeared through Robco and as the insurance

written through Kenilworth exceeded its reserves to a greater and greater extent. Like the business deals in *Bailey*, the business arrangements here could conceivably have generated a profit, but they could as easily—and actually did—result in financial catastrophe. In essence, the plan here entailed risks not permitted by the laws and regulations designed to protect insurance agencies—and the policyholders and claimants who depend on those agencies. It is not necessary that a plan actually result in financial loss as long as it is aimed at the fraudulent deprivation of some of the victim's money or property. *United States v. Dial*, 757 F.2d 163 (7th Cir.1985); *United States v. Reicin*, 497 F.2d 563 (7th Cir. 1974). Fraudulent deprivation of Kenilworth's money was no less a fraud because it was part of a scheme that might have generated a profit.

At issue here are the financial assets of the alleged victims, and not nebulous rights to have business conducted honestly.[5] Accordingly, we affirm the denial of the defendants' motion to vacate their convictions and sentences in light of *McNally*.

### B.

The defendants challenge the sufficiency of the evidence in this case on a number of points. Of course, defendants bear a heavy burden, for the verdict must be sustained if " '*any* rational trier of fact could have found guilt beyond a reasonable doubt.' " *United States v. Reynolds*, 801 F.2d 952, 954 (7th Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). In order to convict the defen-

---

the scheme alleging deprivation of intangible rights is identical to that alleging deprivation of property; where the two are identical, the analysis from *Wellman* is more appropriate than that from *Eckhardt* or *Cooke*.

5. Thus this case is easily distinguishable from cases such as *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988), in which the only property or money at issue was bribe money received by a state judge. This money could hardly have been characterized as the property of the state or its citizens. Further, the person from whom the bribe money was taken in *Holzer* was the perpetrator of the scheme, not its victim. The

victim of bribery schemes such as that in *Holzer* is arguably the public, which is robbed of the proper administration of its system of justice, but not of any property or money. *See also Ward v. United States*, 845 F.2d 1459 (7th Cir. 1988) (affirming district court decision vacating conviction of attorney involved in bribery scheme). Convictions have also been vacated where the indictments failed to allege any deprivation of money or property, *see United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir.1987); *Magnuson v. United States*, 861 F.2d 166 (7th Cir. 1988), but that is clearly not the case here. *See supra* I.B.

dants under 18 U.S.C. section 1341, the government must adduce sufficient evidence with respect to three elements: (1) the existence of a scheme to defraud in which the defendants were participants; (2) intent to defraud on the part of the defendants; and (3) use of the mails in furtherance of the scheme. *See, e.g., Bailey,* 859 F.2d at 1273; *Wellman,* 830 F.2d at 1461.

▮ Both defendants challenge the sufficiency of the evidence as to the existence of a scheme and as to intent. Defendants argue that the plan in this case was designed to save Kenilworth rather than to defraud it, that each of the arrangements taken individually were perfectly legal, that the defendants were not required to report their arrangements to the Department of Insurance and that there is no evidence of knowledge or intent to defraud. In essence, as Judge Aspen noted in his original ruling, these arguments assert a good faith defense, attempting to justify the transactions at issue as bona fide (if perhaps poorly conceived) business transactions. Judge Aspen had before him a great deal of testimony about deliberate attempts to cover up the transactions in this case— not only in order to conceal the involvement of individuals already under indictment for their participation in other transactions but also to keep the Department from shutting down a business that was operating outside of the limits set by state regulations. Judge Aspen concluded that "[i]n light of all the circumstantial evidence but particularly in light of the defendants' sophistication in the insurance business, that defense is not persuasive. It is not conceivable that they did not fully know of the machinations, the fraud that was being perpetrated." Record at 864. This conclusion is well-supported by the evidence in the record. That the transactions should have been reported to the Department of Insurance is self-evident from an examination of the pertinent Illinois statutes.

▮ Patterson argues that because he did not actually convert any of the Robco funds to his own personal use, his conviction should be reversed. However, the evidence showed that Patterson asked Robco's bookkeeper to credit his account $2,000 per week, an amount that he himself conceded he would eventually have collected. Even had this not been the case, it is not necessary that a participant in a fraudulent scheme actually profit from that scheme before he or she can be convicted for participating.

▮ In addition, Patterson challenges the sufficiency of the mailings. The eight mailings in the indictment were insurance premiums on Kenilworth policies submitted to Robco through Patterson. In order to satisfy the mail fraud statute, these mailings must have been integrally involved in the scheme to defraud, so that there was "some link between the mailing and the success of the scheme." *United States v. Kwiat,* 817 F.2d 440, 443 (7th Cir.1987); *see also United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *United States v. Bonansinga,* 773 F.2d 166 (7th Cir.1985). The mailing itself may be "innocent," as long as it is an integral part of the scheme. *United States v. Green,* 786 F.2d 247, 249 (7th Cir.1986). In this case the mailings were an integral part of the arrangement between Kenilworth and Robco. Indeed, the mailings contributed to the success of the scheme while it was in place, because they were among the payments first sent to Kenilworth and then forwarded to Robco in pursuance of the scheme to divert Kenilworth's funds.

The evidence as to the scheme, the defendants' intent and the mailings was fully adequate to support the court's ruling. The defendants have failed to meet their quite heavy burden in this regard.

### C.

▮ Cosentino objects to Judge Aspen's supplemental fact-finding on remand on the grounds that it constituted double jeopardy in violation of the fifth amendment. As noted in *Holzer,* it is a "nice question" whether a defendant whose conviction is vacated post–*McNally* because of insufficient evidence of property deprivation may then be retried, with the government introducing new evidence to prove property dep-

rivation, "without violating the double-jeopardy clause." *Holzer*, 840 F.2d at 1349.

In this case the defendant was not retried, but the court did make supplemental findings of fact in considering the defendant's case on remand. Although these findings did furnish new support for a finding of property deprivation to uphold the original conviction, they were based on evidence originally submitted at trial rather than newly-introduced evidence and they purported to clarify the court's original finding rather than create a new one.

The defendant found the court's action particularly objectionable in light of Judge Aspen's original refusal during closing argument to entertain arguments about the part of the indictment charging the defendants with scheming to "obtain money by means of false and fraudulent pretenses and representations." *See supra* Section I.B. This action would indeed be a serious problem had Judge Aspen refused to allow *evidence* on this point. And it might be problematic if we were conducting our review specifically based on the "obtaining money by false pretenses" part of the indictment. Although loss of money is alleged most explicitly in that portion of the indictment, loss of money is necessarily also alleged in the portion of the indictment charging intangible rights violations. As we commented above, the scheme described in intangible rights language is identical with the scheme to "utilize and operate Kenilworth for the purpose of obtaining money by improperly converting to their use Kenilworth insurance and bond premiums." Appendix of Appellant Cosentino at 13. To convict the defendants of defrauding Kenilworth of its right to their honest services, the court necessarily had to convict them of a scheme that also deprived Kenilworth of financial assets.

This is apparent in arguments that were successfully presented to the district court. For example, in its final argument at trial, the government commented:[6]

So that was the essence of the scheme to defraud, ... to conceal the way in which they were going to try to revive Kenilworth, and to conceal the fact that they were bringing in all this premium money. In turn, that is a fraud on the policyholder.... [W]e don't know what happened to [the] money when it got to Kenilworth except a little bit through Mr. Patterson's testimony, who said it was used to pay the expenses of Kenilworth.

Logically, that is not what the money should have been used for. Some should have been put in reserve funds, some should have been put in the surplus

. . . .

*Id.* at 851–52. The government had also discussed deprivation of money in addressing a challenge to the sufficiency of the mailings involved in the scheme: "[T]here is no question that this whole scheme to defraud revolved around getting money. And the way they got money was through the checks being mailed into Robco." *Id.* at 857.

Thus the convictions in this case clearly survive under the *Wellman* analysis currently employed in this circuit with respect to the portion of the indictment charging an "intangible rights" scheme alone. The reason for this is that the scheme as described necessarily involved a deprivation of property. It is unclear what Judge Aspen meant by his original comment about the "obtaining money by false pretenses" part of the indictment, but in order to find the defendants guilty of intangible rights violations he necessarily also found that they had engaged in a scheme to deprive Kenilworth and its policyholders of money. Thus the statements contained in his later factfinding are consistent as a matter of substance—if not of form—with his original decision in the case. We reach this conclusion after careful scrutiny, for in general a subsequent finding reinterpreting a prior ruling in light of changes in the law is not necessarily to be favored and should be subjected to sharp scrutiny. It

---

6. These comments during the government's final argument echo its discussion of the financial aspects of the scheme in question in this case during its opening and closing arguments, *see* Record at 8–11, 809, 816 (purpose of scheme was "to siphon off the money from the Kenilworth Insurance Company").

might be that in some future case a subsequent reinterpretation could so clearly conflict with original findings, or so patently rely on evidence not received at the original trial, that double jeopardy is implicated. But such was not the case before us.

### D.

 Patterson urges that the district court's decision to sentence him more harshly than his co-defendants constituted an abuse of discretion. Our reading of the sentencing hearing transcript convinces us that this was not the case. Judge Aspen gave a reasoned explanation for each of his sentencing decisions in this case, and he expressed more doubt about Patterson than about any of the other defendants:

> As to Mr. Patterson, you clearly in my view participated in this scheme for no motive other than to enrich yourself unjustly. In my view, it is a crime that was motivated by greed. Although you throw yourself on the mercy of the Court, I am not convinced to this day that you have acknowledged perhaps, not even in your own mind your responsibility for the offense which occurred.

Transcript at 50. By contrast, Judge Aspen felt that Mitchell had "fully and sincerely perhaps belatedly accepted full responsibility" for his criminal acts, and that those acts were not motivated by personal greed but by Mitchell's admittedly misguided zeal to save a foundering company. *Id.* at 48–49. Cosentino was, in the court's view, "not as culpable in terms of the main offense as some of the others." *Id.* at 52. This is certainly an adequate explanation of the disparity in sentences, which was in any event not of major dimensions. *See United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *United States v. Ford,* 840 F.2d 460 (7th Cir.1988); *United States v. Ely,* 719 F.2d 902 (7th Cir.1983).

### III.

The indictment in this case charged the defendants with a scheme to deprive Kenilworth and its policyholders of money, thus stating an offense under 18 U.S.C. section 1341. The evidence presented at trial was fully adequate to support the defendants' convictions, and the defendants were not subjected to double jeopardy by Judge Aspen's subsequent findings. Further, there was no abuse of discretion in Patterson's sentencing. The decision of the district court is

AFFIRMED.